344 A.2d 869
**COMMONWEALTH of Pennsylvania**
v.
**James T. BAILEY, a/k/a Thomas Morgan,
Appellant.**

Supreme Court of Pennsylvania.

Argued March 14, 1975.

Decided Oct. 3, 1975.

**356**

John J. Dean, John H. Corbett, Jr., John B. Yoedt, Bruce A. Carsia, Pittsburgh, for appellant.

John, J. Hickton, Dist. Atty., Robert L. Eberhardt, Asst. Dist. Atty., Pittsburgh, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

In June, 1970, appellant James Bailey was found guilty by a jury of murder in the second degree for the slaying of Helen Robinson. A judgment of sentence of imprisonment for ten to twenty years was imposed and an appeal taken to this Court. On January 19, 1973, we reversed, finding that the trial court had erred in excluding certain evidence and in its charge to the jury. *Commonwealth v. Bailey,* 450 Pa. 201, 299 A.2d 298 (1973). On September 25, 1973, a second trial before a jury commenced, resulting in a verdict of guilty of voluntary manslaughter on September 28, 1973. Post-verdict motions were de-

nied and appellant was sentenced to imprisonment for six to twelve years [1] and to pay a fine of 6¼ cents and the costs of prosecution. This appeal followed.[2]

Appellant contends that he was denied a speedy retrial after the reversal of his initial conviction [3] and that the court erroneously instructed the jury. We find no merit in either contention and therefore affirm.

█ Before we reach appellant's contentions, we must consider the Commonwealth's claim that they were not properly preserved for appellate review. Appellant's written post-verdict motions were simply boiler-plate challenges to the sufficiency of the evidence. His present claims were presented as supporting the post-verdict motions only at oral argument on those motions. The court en banc noted that this method of presentation failed to comply with the requirements of Rule 1123(a) of the Pennsylvania Rules of Criminal Procedure but nevertheless considered the claims on their merits and rejected them. The Commonwealth contends that failure to properly present these claims in post-verdict motions precludes their consideration on appeal, relying upon *Commonwealth v. Blair*, 460 Pa. 31, 33 n. 1, 331 A.2d 213, 214 n. 1 (1975).

In *Blair*, the written post-verdict motions were identical to those involved here and counsel also made more

1. The sentencing court directed that appellant be given credit for the twenty-six months he was in custody on this charge from the time of his arrest until the time, during the pendency of the first appeal, when he posted bond and secured release from state custody. Subject to this credit, the court directed that the sentence commence upon completion of any other sentence presently being served by appellant.

2. See Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1975).

3. The right to a speedy trial is guaranteed by article I, section 9 of the Pennsylvania Constitution and the Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment. *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).

specific oral motions which were considered by the trial court on their merits. There we wrote:

"The practice in some judicial districts of ignoring the requirements of Rule 1123(a) is condemned. Henceforth, issues not presented in compliance with the rule will not be considered by our trial and appellate courts."

Id.

However, because the long-standing practice of some courts of accepting and ruling upon oral motions tended to mislead counsel into relying upon that practice, we did consider the matters tendered by *Blair* in his oral motions. Similarly, where, as here, all of the relevant events occurred before *Blair* served notice that compliance with Rule 1123(a)'s requirement of written motions would henceforth be required, it would be unfair to impose forfeiture of claims of error solely on the basis of failure to present written motions based upon those claims. This is especially so where the trial court condoned the non-compliance with Rule 1123(a) by passing upon the merits of the issues tendered orally. Consequently, we conclude that appellant's contentions are properly before us.

# I

Appellant's speedy trial claim is based on the following facts. Appellant was arrested on September 19, 1969, and indicted for murder on December 9, 1969. A jury trial commenced on June 1, 1970, and concluded on June 4 with a verdict of guilty of murder in the second degree. Post-verdict motions were denied on March 1, 1971, and an appeal to this Court ensued.

At the time appellant was arrested he was on parole from a federal sentence for armed robbery of an insured savings and loan association. On October 3, 1969, the Department of Justice initiated proceedings for the revo-

cation of appellant's parole charging that appellant had violated the conditions of parole (1) by committing various crimes in the court of the episode in which the present offense was committed[4] and (2) by having a firearm in his possession when arrested without being authorized to possess a firearm. A parole detainer was therefore lodged against appellant. At some time after October 3, not shown by the record, appellant's parole was apparently revoked by the United States Board of Parole on the basis of these charges.

While his appeal was pending before this Court, appellant sought release on bail. On May 20, 1971, this Court directed the trial court to set reasonable bail. Bail was set at $5000 and posted on November 5, 1971, whereupon appellant was "released" from state custody. However, pursuant to the parole detainer, he was transferred to federal custody and returned to the federal prison at Leavenworth, Kansas, where he remained until returned to the Commonwealth for retrial.

On January 19, 1973, this Court reversed appellant's conviction and granted a new trial. The Commonwealth, apparently unaware that appellant was then incarcerated at Leavenworth, set the case for trial on March 7, 1973, together with the case of William Trautman, appellant's codefendant.[5] Upon further examination of the record, the Commonwealth became aware that the trials of ap-

---

4. Appellant was initially charged with armed robbery and certain weapons offenses allegedly committed at the same time as the slaying involved here. After appellant was convicted of murder, these charges were nolle prossed. A motion by the Commonwealth to remove the nolle pros in order to permit those charges to be tried together with the charge of murder at the retrial was denied.

5. Trautman was originally scheduled to be tried together with appellant in June, 1970. However, the trials were severed and Trautman was scheduled for trial in September, 1970. He was released on bail and his whereabouts thereafter were unknown until he was rearrested on unrelated charges on August 19, 1972. He was finally tried on September 15, 1973, and found guilty of murder in the second degree, armed robbery, and conspiracy.

**360**

pellant and Trautman had been severed in 1970. It then requested that a new date be set for separate trials of the two defendants and the cases were listed for trial on June 18, 1973. On May 18, appellant wrote to the clerk of courts inquiring when his case would be retried. On May 24, a letter was mailed to appellant informing him of the June 18 trial date. Shortly before the case was due to come to trial, the Commonwealth discovered that appellant was incarcerated in Leavenworth and could not be obtained without 60 to 90 days notice. It then initiated proceedings to regain custody of appellant and obtained a new trial date in September. On August 7, appellant moved to dismiss the indictment for failure to afford him a speedy retrial. This motion was denied and appellant was brought to trial on September 24, 1973, 248 days after we reversed his prior conviction.

The test for determining whether a defendant has been denied a speedy trial was articulated in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), and summarized by this Court in *Commonwealth v. Ware*, 459 Pa. 334, 346, 329 A.2d 258, 264 (1974):

" ' [A]ny inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case . . . .' *Barker v. Wingo*, supra, [407 U.S.] at 522, 92 S.Ct. at 2188. We are required to 'engage in a difficult and sensitive balancing process,' id. at 533, 92 S.Ct. at 2193, 'in which the conduct of both the prosecution and the defendant are weighed.' Id. at 530, 92 S.Ct. at 2192 (footnote omitted). The factors we must consider in this balancing process are '[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.' Id. (footnote omitted). . . .

"Length of delay serves as a triggering mechanism. 'When a delay is so extensive that a court considers it presumptively prejudicial, inquiry into the three other factors is necessary.' *Commonwealth v. Williams*, 457

Pa. 502, 507, 327 A.2d 15, 17 (1974); see generally *Barker v. Wingo,* supra, [407 U.S.] at 530, 92 S.Ct. at 2192." (footnote omitted)

The Commonwealth first argues that we need not proceed beyond this threshold question because a delay of 248 days is not "presumptively prejudicial." [6] While we see some merit in this contention, we need not decide the question because we are convinced that the other factors dictate the conclusion that appellant has not been deprived of a speedy trial.

■ There were basically two reasons for the delay in appellant's retrial. One was the necessity of securing custody of appellant from the federal authorities, apparently requiring 60 to 90 days from the date of the request for custody. The other was the Commonwealth's negligent failure to discover that this procedure was necessary. While the former reason entirely justifies the portion of the delay caused by it, the latter reason weighs against the Commonwealth, though less heavily than would a deliberate attempt to delay the trial.[7]

6. But see *United States v. Strunk,* 467 F.2d 969 (7th Cir. 1972), rev'd on other grounds, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973) (delay of 306 days held to constitute denial of speedy trial). Of course the necessity of determining this question is obviated in all cases where convictions were reversed after June 8, 1973, when this Court adopted Pa.R.Crim.P. 1100. Rule 1100(e) requires that in such cases the new trial must commence within 120 days (90 days until the rule was amended on December 9, 1974) after entry of the order granting the new trial unless good cause for delay is shown. See *Commonwealth v. Woods,* 461 Pa. 255, 336 A.2d 273 (1975).

7. "Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay."
*Barker v. Wingo,* 407 U.S. 514, 531, 92 S.Ct. 2182, 2192, 33 L.Ed. 2d 101 (1972) (footnote omitted).

The third factor to be considered in evaluating appellant's claim is his assertion of the right to a speedy trial. Appellant was entitled to assume that the Commonwealth would proceed promptly until events showed otherwise. Moreover, on May 18, he wrote to the clerk of courts inquiring as to the date of his retrial. Even if this is not considered as an assertion of the right to a speedy trial, the clerk's reply indicating that the trial was scheduled for the following month surely explains the failure to take further action prior to the date of the scheduled trial. It is true appellant did not thereafter assert his right until August 7, 1973. However, in view of the fact that appellant was both uncounseled and incarcerated, we conclude that little significance can be attached to this delay. Consequently, we must consider this a case in which appellant has fully asserted his right to a speedy retrial throughout the relevant period. Compare *Commonwealth v. Ware,* 459 Pa. 334, 349, 329 A.2d 258, 266 (1974) ("record demonstrates that appellant did not want a speedy trial").

Finally we turn to the question of prejudice to appellant resulting from the delay.

"Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."

*Barker v. Wingo,* supra, 407 U.S. at 532, 92 S.Ct. at 2193 (footnote omitted).

Appellant makes no claim that his defense was impaired by the delay and does not rely upon any anxiety resulting from an unresolved criminal prosecution.

Rather he seeks to rest his claim solely upon his continuous incarceration from the time of his arrest in 1969, to the time the case was brought to trial in 1973.

In evaluating appellant's claim, it is important to remember that, so far as the Commonwealth was concerned, he was released on bail on November 6, 1971. Under Pa.R.Crim.P. 4011, the bond would remain effective until final disposition of the case unless revoked.[8] Thus, during the period between the grant of a new trial and the commencement of that trial appellant was not incarcerated *on the instant charge.*[9]

However, this does not end our inquiry. The United States Supreme Court considered a similar situation in *Smith v. Hooey*, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969). In that case the defendant claimed that he had been denied a speedy trial on charges pending in Texas while he was incarcerated in the federal penitentiary at Leavenworth. The Court wrote:

> "At first blush it might appear that a man already in prison under a lawful sentence is hardly in a position to suffer from 'undue and oppressive incarceration prior to trial.' But the fact is that delay in bringing such a person to trial on a pending charge may ultimately result in as much oppression as is suffered by one who is jailed without bail upon an untried charge. First, the possibility that the defendant already in prison might receive a sentence at least partially concurrent with the one he is serving may be forever lost if trial of the pending charge is postponed.

8. While the record does not contain any order revoking bond, appellant applied for bail pending this appeal, which was denied on October 12, 1973. Apparently he was kept in custody after his return to this jurisdiction because of the federal sentence he was then serving. He was again paroled from his federal sentence on January 22, 1975, and commenced serving the sentence imposed in this case.

9. This is the only period during which appellant claims he was denied a speedy trial.

Secondly, under procedures now widely practiced, the duration of his present imprisonment may be increased, and the conditions under which he must serve his sentence greatly worsened, by the pendency of another criminal charge outstanding against him."

Id. at 378, 89 S.Ct. at 577 (footnotes omitted).

To the extent that there was unnecessary delay in appellant's retrial, "the possibility that he might receive a sentence at least partially concurrent with the one he is serving" was lost. The question of whether appellant has suffered the second type of prejudice identified by the Supreme Court is more complex.

Appellant contends that not only has "the duration of his present imprisonment [been] increased" by the pendency of this charge against him, but that this charge is "the sole basis" for his present imprisonment. This contention is founded upon the fact that the incident giving rise to these charges was the ground on which appellant's parole was revoked.[10] We conclude that there is no merit in this contention.

While the record does not contain the actual order revoking appellant's parole, the warrant on which the original parole detainer was based recites two reasons for revocation. First, it alleged that appellant's actions on September 19, 1969, breached the condition that he would commit no crimes while on parole, noting that he had been charged with armed robbery, murder, and certain weapons offenses. Second, it alleged that appellant had been found in possession of a firearm without written permission of his probation officer, as required by the conditions of his parole. The latter ground is entirely unrelated to the instant charge (although appellant con-

10. Appellant contends that the revocation was based solely upon his conviction of murder and that he was denied a hearing on revocation in violation of the parole board's own rules. To the extent that this is true, it is not the responsibility of the Commonwealth. Appellant's complaint must be directed to the United States.

tends that he took the firearm in question from the husband of the deceased in the course of defending himself). Moreover, the Board of Parole would necessarily concern itself with appellant's actual conduct rather than the pendency of charges in deciding whether to revoke his parole. Consequently, we conclude that the pendency of the instant charge was not, as such the cause of appellant's incarceration during the period between the grant of a new trial and the commencement of that trial.

In summary, we have a delay of 248 days in the retrial of appellant, part of which was attributable to the negligence of the attorney for the Commonwealth. Appellant asserted his right to a speedy retrial and suffered some prejudice, in that the possibility of a sentence "at least partially concurrent with the one he is serving" was, to the extent of the unnecessary delay, "forever lost." Striking the balance, we conclude that in light of the relative brevity of the unnecessary delay,[11] the correspondingly minimal prejudice suffered by appellant, and the relatively neutral cause of the delay, appellant was not denied his right to a speedy retrial.

## II

Appellant also contends that the trial court erred by instructing the jury on the liability of conspirators for the acts of their coconspirators committed in furtherance of the conspiracy. He does not contend that the challeged instruction [12] misstated the law, but claims

---

11. In view of the necessity of obtaining custody of appellant from the federal authorities and the delay of 60 to 90 days required for this purpose, appellant's trial could not realistically have been scheduled before May, 1973. Allowing for an absolute minimum of delay caused by scheduling problems, it does not seem that more than half of the delay in appellant's retrial could possibly be attributed to the Commonwealth's negligence.

12. The pertinent portion of the charge went as follows:
"Members of the jury, you may have observed that there were two persons charged in this indictment with the offenses

that, in light of his prior acquittal of murder in the first degree, it had no application in this case. We conclude that it was not error to instruct the jury on this subject.

In order to understand appellant's contention and our disposition of it, it is necessary to consider the conflicting versions of the facts presented at trial. We summarize the pertinent portions here.

The principal witness for the Commonwealth was Cleveland Robinson, husband of the deceased. He testified that he had never seen either appellant or Trautman before September 19, 1969. On that day they appeared on his porch, representing themselves to be from the Internal Revenue Service. Robinson invited them in. Immediately after they entered they produced guns, beat him about the head, sprayed him with some kind of chemical, and demanded that he give them money. He told them that if they wanted money, they should come upstairs.

They then followed him to his bedroom, where his wife was sitting on the bed. Robinson reached under the mattress and drew forth a pistol, which he fired at appellant, striking him in the shoulder. Appellant and

named in the indictment. Only one of them appeared before you at trial.

"You may even have heard some reference to the trial of the other Defendant, William Trautman, during this case; however, this should be of no concern to you in your deliberations of the verdict in the case of James Bailey. But it may be necessary, I believe, to state a pertinent contention of law, and that is, when it is alleged that two or more persons agree or combine with one another to perform an unlawful act and the jurors so find such an agreement or combination, then each may be criminally responsible for the act or acts of his associate or confederate committed.

"In furtherance of the common design in the contemplation of the law, the act of one is the act of all. These - - - if two persons combine to commit a crime and in the carrying out of the common purpose another person is killed by one or the other alleged conspirators - - - then the one who enters into the combination, but does not personally or physically commit the wrongful act, is equally responsible for the acts of the other.

"It is for you to determine if this principle of law applies to the facts, depending upon how you find the facts to be."

Robinson then struggled for the gun, which appellant ultimately wrested away from Robinson. In the course of the struggle, Robinson was shot. Appellant then told Trautman to "get rid of" Mrs. Robinson. Immediately afterwards appellant and Trautman departed. Robinson then discovered that his wife was dead of a gunshot wound. He did not testify to seeing either appellant or Trautman shoot her.

Appellant's testimony differed from Robinson's in a number of important respects. According to him, Robinson was a loan shark from whom he had borrowed money when he lost his job. He had fallen behind in his payments and went to see Robinson to offer an explanation. Trautman agreed to drive him there because appellant's own car was out of order. Robinson admitted them to his house [13] and appellant began to explain why he had fallen behind in his payments and where he hoped to get the money to satisfy the debt. Robinson then made a statement which appellant construed as a threat to his family and began to strike appellant with a hard object.[14] Appellant then struggled with Robinson and succeeded in taking the object away from him.

At this point Robinson fled up the stairs, saying "I'm going to kill you now." Appellant followed Robinson to the bedroom and the struggle there followed, approximately as Robinson described it, except that appellant did not remember what transpired from the time he was shot until sometime the next day. He did not believe that Trautman followed him upstairs.

Trautman's testimony basically corroborated appellant's account of the events which transpired in Robinson's living room. He testified that he fled from the

13. Appellant denied that they represented themselves as being from the Internal Revenue Service.

14. At the time appellant did not know what this object was. From later events, appellant infers that it was one of the two guns found in his possession when he was arrested. (The other gun was the one taken from Robinson in the struggle in the bedroom.)

house as soon as Robinson went upstairs and so did not know anything about the struggle in the bedroom.

Appellant contends that his acquittal of murder in the first degree when the case was first tried necessarily determined that the killing had been neither "willful, deliberate, and premeditated" nor "committed in the perpetration of, or attempting to perpetrate any . . . robbery." [15] Consequently, he contends, the Commonwealth is collaterally estopped to assert either theory as a basis for his conviction in this proceeding. See *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (collateral estoppel is ingredient of double jeopardy clause). From this premise he argues that there was no basis for an instruction on the liability of conspirators because any conspiracy would involve one of these two theories.[16] Consequently, he concludes that the instruction allowed the jury to convict on an impermissible basis.

We reject this argument because we conclude that there was a basis on which appellant might have been guilty of second degree murder as a co-conspirator of the actual killer which does not involve either a willful, deliberate, and premeditated killing or one perpetrated in the course of an attempt to commit robbery. Consequently, it was not error to instruct the jury on this subject.

The jury might have believed appellant's statement that Robinson was a loan shark from whom appellant had borrowed money. It might also have believed Robinson's account of the events in the living room except for the assertion that appellant and Trautman had demanded

15. Act of June 24, 1939, P.L. 872, § 701 (formerly codified as 18 P.S. § 4701 (1963)), repealed by Act of December 6, 1972, P.L. 1482, No. 334, § 5.

16. A conspiracy to commit robbery would necessarily require that the episode on September 19 have been an attempt to commit a robbery. A conspiracy to commit murder would necessarily indicate that the killing was "willful, deliberate, and premeditated."

money. This set of facts would support the inference that appellant and Trautman had conspired to beat Robinson in order to intimidate him into foregoing collection of the debt, at least until appellant's financial condition improved. If the jury then also believed Robinson's account of the events in the bedroom, it could conclude that Trautman fired the fatal shot and that appellant was guilty of murder in the second degree as a co-conspirator.

■ The judge did not instruct the jury as to the elements of any particular crime which appellant might have conspired with Trautman to commit. Thus the instruction did not, in terms, authorize the jury to convict on the basis of a conspiracy to commit robbery or murder, which bases appellant claims the Commonwealth is estopped to assert. Appellant made no request for instructions forbidding the jury to convict on the basis of a conspiracy to commit robbery or murder. The only objection urged in the trial court was that there was no basis on which appellant could properly be found guilty on the basis of a conspiracy. Consequently, appellant may not urge on appeal that the court erred in failing to give additional instructions allegedly necessary to clarify the instruction objected to. See Pa.R.Crim.P. 1119(b) ;[17] *Commonwealth v. Johnson,* 457 Pa. 554, 562, n. 8, 327 A. 2d 632, 637 n. 8 (1974); *Commonwealth v. Martinolich,* 456 Pa. 136, 160 n. 15, 318 A.2d 680, 693 n. 15, cert. denied, 419 U.S. 1065, 95 S.Ct. 651, 42 L.Ed.2d 661 (1974); *Commonwealth v. Watlington,* 452 Pa. 524, 306 A.2d 892 (1973).

Judgment of sentence affirmed.

NIX, J., concurs in the result.

17. Rule 1119(b) provides in pertinent part:
    "No portions of the charge nor omissions therefrom may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate."