369 A.2d 350

COMMONWEALTH of Pennsylvania

v.

James WESTBROOK, Appellant.

Superior Court of Pennsylvania.

Submitted March 17, 1975.

Decided Nov. 22, 1976.

---

Richard R. Lunenfeld, Philadelphia, for appellant.

Steven H. Goldblatt, Assistant District Attorney, and F. Emmett Fitzpatrick, District Attorney, Philadelphia, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PRICE, Judge:

This is an appeal *nunc pro tunc* from judgment of sentence. Appellant, James Westbrook, was arrested on May 30, 1972, and charged, *inter alia,* with aggravated robbery. An Assistant Defender from the Defender Association of Philadelphia represented appellant at the preliminary hearing on these charges. On November 15 and 16, 1972, appellant, having waived his right to a jury trial, was tried before a judge and found guilty of aggravated robbery. At this trial appellant was represented by a different Assistant Defender. On November 22, 1972, trial counsel filed post-trial motions for a new trial and in arrest of judgment. These motions contained only *pro forma* claims that the verdict was against the evidence, the verdict was against the weight of the evidence and the verdict was contrary to law. On June 26, 1973, post-trial motions were argued by a third Assistant Defender and denied.[1] Appellant was then

---

1. Issues in this case could possibly have been preserved by the oral argument of post-trial motions, which took place prior to *Commonwealth v. Blair*, 460 Pa. 31, 331 A.2d 213 (1975). *Commonwealth v. Bailey*, 463 Pa. 354, 344 A.2d 869 (1975). Here, however, the oral argument is not recorded; because no direct appeal was taken, we have no opinion of the trial court to reveal what post-trial arguments it considered; and appellant does not allege that any of the grounds for relief he advances in the instant appeal were raised in this manner.

sentenced to 2½ to 7 years incarceration in the State Correctional Institution at Graterford. No direct appeal was taken to this court, although both appellant and his trial counsel testified at a subsequent PCHA hearing that appellant had indicated to the defender's office his desire to appeal, and that he had received appellate forms which were subsequently completed and returned. No explanation of the lack of further action appears in the record.

[1] On April 16, 1974, appellant filed a *pro se* petition for relief under the Post Conviction Hearing Act.[2] In his petition, appellant claims numerous violations of his rights. Only two of these allegations, denial of the right to representation by effective counsel and denial of the right to appeal, are relevant here. An evidentiary hearing was held on June 5, 6, and 26, 1974, at which appellant was represented by private counsel. The hearing judge, finding that appellant had not waived his right to appeal, granted him the right to appeal to this court *nunc pro tunc*. All other claims in the petition were denied.[3] This appeal followed.

■■ Appellant raises three arguments in support of his prayer for a new trial: (1) that a mistrial should have been granted when the district attorney indirectly informed the trial judge that appellant had previously been convicted of a criminal offense; (2) that appellant

2. Act of January 25, 1966, P.L. (1965) 1580, § 1 (19 P.S. § 1180–1) *et seq.* (Supp.1976–77).

3. Where a post-conviction court determines that a petitioner is entitled to a direct appeal, it should make no further decision as to other claims for post-conviction relief. *Commonwealth v. Webster*, 466 Pa. 314, 353 A.2d 372 (1976). The court should then determine whether proper post-trial motions have been filed. In the absence of such motions, as in the instant case, leave should be granted to file post-trial motions *nunc pro tunc*. Such a procedure allows the trial court an opportunity to grant relief or answer allegations of error, thus possibly eliminating the necessity of an appeal, or, in the alternative, providing the appellate court with a complete record and issues ripe for review.

was inadequately advised of his right to a jury trial; and (3) that trial counsel was ineffective. Only the final issue is properly before us. The boiler plate post-trial motions filed by trial counsel are totally inadequate to preserve claims of pre-trial and trial error. Such issues, unless raised specifically in post-verdict motions, are waived. *Commonwealth v. Blair,* 460 Pa. 31, 33 n. 1, 331 A.2d 213, 214 n. 1 (1975); *Commonwealth v. Reid,* 458 Pa. 357, 326 A.2d 267 (1974).[4]

In this case, because the PCHA hearing court granted leave to appeal to this court *nunc pro tunc* rather than leave to file proper post-trial motions *nunc pro tunc,* two of the claims in this appeal are not preserved and cannot be given consideration. *Commonwealth v. Reid, supra; Commonwealth v. Agie,* 449 Pa. 187, 296 A.2d 741 (1971). However, since appellant raised the issue of ineffective assistance in his PCHA petition and at the subsequent PCHA hearing, and as appellant is represented by different (than trial) counsel on this appeal, this contention is properly before us. *Commonwealth v. Twiggs,* 460 Pa. 105, 331 A.2d 440 (1975); *Commonwealth v. Dancer,* 460 Pa. 95, 331 A.2d 435 (1975).

A short review of the factual history of this case is necessary to an analysis of appellant's ineffective assistance claim. Appellant was charged with the robbery and beating of one Robert Really, which took place on May 23, 1972, in South Philadelphia. On May 30, 1972, Mr. Really was in the same area and observed appellant

4. Here, appellant alleged ineffectiveness of counsel in his PCHA petition and at the post-conviction hearing. However, at neither of the aforementioned stages, nor in the appeal before us, does appellant raise trial counsel's filing of only *pro forma* post-trial motions as an instance of ineffectiveness. Thus, in order for this court to reach the two allegations which appellant raises for the first time in this appeal, we would have to interpose, *sua sponte,* trial counsel's failure to file proper post-trial motions as a ground for a finding of ineffectiveness. This we will not do.

In *Commonwealth v. Drummond,* 238 Pa.Super. 311, 357 A.2d 600 (1976), this court (per Hoffman, J.) applied a parallel analysis to a similar procedural situation.

standing in a parking lot. Mr. Really sought a patrolman and, on the basis of his identification of appellant as his assailant, an arrest was effected.

At trial, appellant's defense rested on a theory of misidentification. It was asserted that appellant's brother, Alphonso Westbrook, rather than appellant, had robbed and beaten Mr. Really. Two witnesses, appellant's mother, Barbara Lou Westbrook, and a prison social worker, Scott T. Wilson, gave testimony for the defense. Mrs. Westbrook asserted that Alphonso had acknowledged his guilt to her. Wilson, on the other hand, recounted a meeting between the two brothers and himself where appellant had maintained his own innocence and his brother's guilt, while Alphonso had not protested. Detective Bonsera, who had been present at appellant's preliminary hearing, testified that at some point in that proceeding appellant's counsel suggested that Alphonso was going to admit that he had committed the crime with which appellant was charged.[5] Detective Bonsera indicated further that before Alphonso could be approached regarding a statement, a second, unidentified (in the record before us) Assistant Defender advised Alphonso not to make any statement relating to the robbery of Mr. Really.[6] During the period encompassing the pre-trial and trial stages of appellant's case, Alphonso was represented by another Assistant Defender (not one of those who represented appellant) in regard to a different criminal charge. Alphonso, at all times prior to and subsequent to the recounted incident, has declined to make a statement regarding this robbery and has consistently denied any involvement therein.

Appellant first contends that his trial counsel was ineffective in that he was subject to a conflict of interest in presenting appellant's defense. Our courts have typi-

5. No such suggestion or intimation, either by appellant's counsel or Alphonso, appears in the record of appellant's preliminary hearing.

6. This incident is similarly unreflected in the record.

cally found such conflicts where an attorney or a firm has represented different defendants, with actually or potentially antagonistic interests, in joint or separate trials.[7]

■ There was no such "dual representation" in the instant case. Appellant and his brother Alphonso were not co-defendants, nor were they tried either jointly or separately on the same offense. James and Alphonso were each represented by different members of the same defender office in regard to separate and distinct criminal charges based on factually discrete events.

Given that appellant and Alphonso were not co-defendants and Alphonso was never charged with or tried for the crime in question, the instant situation could not constitute a conflict of interest under traditional analysis. Further, no prejudice to appellant could have resulted at trial since appellant's counsel was not aware, until near the end of the trial, that his office represented both James and Alphonso on different charges.[8] Even following this discovery, trial counsel had neither legal responsibility toward nor other interest in Alphonso such as could have prejudiced his representation of appellant. Appellant's counsel testified that he attempted to secure

7. *See Commonwealth v. Wilson,* 429 Pa. 458, 240 A.2d 498 (1968) (co-defendants, separate trials); *Commonwealth v. Meehan,* 409 Pa. 616, 187 A.2d 579 (1963) (co-defendants, joint trial); *Commonwealth ex rel. Whitling v. Russell,* 406 Pa. 45, 176 A.2d 641 (1962) (co-defendants, joint trial); *Commonwealth v. Booker,* 219 Pa.Super. 91, 280 A.2d 561 (1971) (co-defendants, joint trial).
   *See also* the ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, The Defense Function § 3.5 ("Conflict of Interest") (Approved Draft, 1971): "(b) Except for preliminary matters such as initial hearings or applications for bail, a lawyer or lawyers who are associated in practice should not undertake to defend *more than one defendant in the same criminal case* if the duty to one of the defendants may conflict with the duty to another." (emphasis added)

8. At the PCHA hearing which preceded this appeal, appellant's trial counsel testified that he was not aware, until the testimony of Detective Bonsera at trial, that another member of his office had represented or was representing Alphonso. (N.T. PCH 14, 15)

Alphonso's testimony at trial, first by subpoena and later by requesting a continuance for the purpose of locating him when he apparently absented himself from the courtroom area. (N.T. PCH 8).[9] Further, trial counsel vigorously argued appellant's misidentification defense, introduced supporting testimony from appellant's mother, a prison social worker who had known both appellant and Alphonso, and appellant himself, and introduced pictures of both brothers into evidence to demonstrate their similarity in appearance. Appellant has thus failed to show, in respect to his trial, either actual harm or "the possibility of harm," *Commonwealth v. Breaker,* 456 Pa. 341, 345, 318 A.2d 354, 356 (1974), resulting from the alleged conflict.

The only substantive harm appellant claims as a product of the purported conflict of interest in this case is the advice of an unspecified public defender, given to Alphonso at the scene of appellant's preliminary hearing, not to make a statement regarding his involvement in the crime with which appellant was charged. It is extremely doubtful, in view of Alphonso's subsequent refusal in several instances, including the PCHA proceedings upon which this appeal is based, to admit guilt or involvement, that the advice given by the unidentified public defender reversed or otherwise altered Alphonso's disposition to make a statement or testify. Alphonso did not come forward prior to the preliminary hearing, and appellant and his mother were the only parties who claimed that he had ever admitted being involved in the robbery of Mr. Really. Any supposed detriment which appellant may have suffered as a result of the public defender's advice to Alphonso was not a compromise of one defendant's interests in favor of those of another defendant. It was objective legal advice given to a person never charged with the crime involved.

9. The record does not, however, reflect a request for a continuance for this purpose, and there is some conflict as to whether or not Alphonso was, in fact, subpoenaed.

In *Commonwealth v. Breaker, supra* at 343, 318 A.2d at 355, our Supreme Court stated that "[i]nherent in the right to effective assistance of counsel is the correlative right to be represented by counsel unburdened by any conflict of interest." Appellant's trial counsel was in no way so burdened. Appellant was his only client at the trial, and appellant was given the benefit of his undivided loyalty and interest. *Breaker, supra,* also requires that "a defendant must demonstrate that a conflict of interest actually existed at trial . . . ." and that " ' . . . appellant . . . must at least show the possibility of harm. . . . ' " 456 Pa. at 344, 318 A. 2d at 356. (emphasis added) Appellant herein fails to meet either of these requirements. The only harm resulting from the alleged conflict took place long prior to appellant's trial and on the facts, no conflict existed at trial and thus no possible threat to appellant's interests was present. We perceive no reason to abrogate the established requisites to a finding of conflict of interest under the case law of this Commonwealth.

■ The second ground of ineffectiveness urged by appellant is his trial counsel's failure to secure Alphonso's presence at trial. Although trial counsel's testimony at the PCHA hearing indicated that he requested a continuance for this purpose, no such request is evident in the record.

Assuming that trial counsel failed to seek the disputed continuance, we must determine whether this conduct constituted ineffective assistance. When asked to make a statement or questioned by the police about the robbery of Mr. Really, Alphonso had uniformly declined to cooperate and had denied any connection with the crime. If Alphonso had been called as a *witness* and had *once again declared his innocence,* appellant's misidentification defense might have been seriously impaired, if not totally discredited. In *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967), the

court stated that " . . . a finding of ineffectiveness could never be made unless we concluded that the alternatives not chosen offered a potential for success substantially greater than the tactics actually utilized." 427 Pa. at 605, n. 8, 235 A.2d at 353, n. 8. Considering the facts of this case and the PCHA hearing testimony of Alphonso, where he once more denied having committed the robbery (N.T. PCH 56), we cannot conclude that his trial testimony would have substantially strengthened the appellant's defense or increased the likelihood of his acquittal.

The judgment of sentence of the lower court is affirmed.

SPAETH, J., files a dissenting opinion in which WATKINS, President Judge, and HOFFMAN, J., join.

SPAETH, Judge, dissenting:

My difference with the majority's view of the law of dual representation and conflict of interest is based in large part on the facts of this case. Therefore a fuller recitation of those facts may be helpful.

The theory of the defense was that appellant's brother Alphonso, who closely resembled appellant, had initially attacked Mr. Really and had led the robbery, rather than appellant. At trial, a detective who had been present at appellant's preliminary hearing, the mother of Alphonso and appellant, and a social worker from the Detention Center all offered testimony that tended to prove Alphonso's involvement in the crime. Alphonso himself did not testify.[1]

1. Appellant argues that trial counsel was ineffective because he failed to secure Alphonso's testimony. (Brief for Appellant 5–7.) It is not clear from the record whether Alphonso was ever subpoenaed to appear at the trial, or whether trial counsel requested a continuance when he did not appear. At trial, counsel said that Alphonso had been issued a subpoena.
   THE COURT: I thought somebody testified today that the brother was here this morning.

Detective Bonsera testified that Alphonso had been given a preliminary hearing for an unrelated robbery at the same police station as appellant, and that this hearing had immediately followed appellant's. He said when cross-examined that someone from the Defender Association had informed him that Alphonso might have been implicated in the attack on Mr. Really:

Q. Did you—who did you receive this information from, sir?

A. It was made known in the courtroom that he [Alphonso] participated in the robbery. We all knew

MR. DEUTSCH [appellant's trial counsel]: The brother was served a subpoena, Your Honor.

MR. KOGAN: He was here.

MR. DEUTSCH: And I understand from the family he did come in, that he did come in, and then disappeared. And I further understood that he refused to testify on the behest of his family, that thought it would be proper, and that is why I say to Your Honor that he wasn't man enough to take the witness stand.

THE COURT: Well, he didn't even remain long enough to be viewed. At least it wasn't pointed out to the Court or to the witness whose identification was critical.

MR. DEUTSCH: I think he remained around for approximately 10 or 15 minutes. I didn't see him thereafter, Your Honor.

(N.T.Trial 92–93.)

Immediately following this exchange, the trial judge found appellant guilty. The record is devoid of any request for a continuance so that Alphonso could be found and his testimony obtained. Nevertheless, at the PCHA hearing, trial counsel gave the following testimony:

Q. Was Mr. Alphonso Westbrook subpoenaed?

A. Yes, he was.

Q. And in your own mind, sir, was he a critical witness?

A. The critical witness.

Q. And when Mr. Alphonso Westbrook disappeared, did you ask for a continuance to bring him in here?

A. Oh yes, definitely.

Q. And in fact was he ever brought in?

A. No, he was not.

(N.T. PCH 8.)

Despite this testimony, the Assistant Defender who argued post-trial motions said that Alphonso "should have been subpoenaed and/or arrested." N.T. Post-Trial Motions 4–5, implying that no subpoena had been served. Because of my view of this case, I would not try to decide from such a record whether trial counsel was ineffective for failing to request a continuance and possibly for not even issuing a subpoena for Alphonso.

there was more than one man. There were four involved in the robbery. There was only one identified.

Q. Sir, who made this known to you?

A. This was made known to the Court. The Public Defender said he had something to offer the Court that James [appellant] was held for the charges. The Public Defender said he wanted to make it known to the Court. This was after the proceedings.[2]

Q. So the Public Defender gave you the information that Alphonso had implicated himself; is that correct?

A. That's correct.

Q. Were you present during the time that the Public Defender had a conversation with Alphonso?

A. No, I was not.

Q. Do you know the name of this Public Defender, sir?

A. No, it would be on the record. I don't know his name.

(N.T. Trial 49.)

However, the detective said, when he attempted to secure a statement from Alphonso, "the Public Defender's office . . . decided that they did not want Alphonso to make a statement to the admission of the robbery."

2. None of the discussions among the Assistant Defender or Defenders involved, Detective Bonsera, appellant, and Alphonso is of record. The only indication that the Assistant Defender representing appellant made known any of these circumstances at the preliminary hearing is the following exchange:

MR. SCHAMBELAN: If Your Honor pleases, I would like to have a word with the District Attorney in this case before we proceed.

MR. BERMAN: What is it?

MR. SCHAMBELAN: I would like to have it in private.

MR. BERMAN: If the Court doesn't mind?

MR. SCHAMBELAN: As an officer of the Court, I have a legal request.

THE COURT: Come up here and we will discuss it.

(Off-the-record discussion)

MR BERMAN: Your Honor, we rest our case in this matter. (N.T. Prelim. H. 9.)

(N.T. Trial 45–46.) On direct, the detective testified to the following conversations with Alphonso and with the mother of Alphonso and appellant:

At the particular time of the hearing, it was suggested that Alphonso Westbrook was going to admit to this robbery. OK. And the Public Defender at that time, I can't recall his name, he said that he didn't want Alphonso Westbrook to admit to the robbery, or he wouldn't let Alphonso make a statement . . . Mrs. Westbrook had spoken to the complainant also outside in the hearing room after both of those hearings had taken place. Prior to Mrs. Westbrook talking to Alphonso, I asked Alphonso if he would make a statement to me, and he said no. And I came back to the hearing room and explained to Mrs. Westbrook that he would not make a formal statement. And she asked for the opportunity to talk with him . . . .. She asked me if she could have a few minutes in private with both her sons. And I stepped back out of earshot. She proceeded to talk with them. And when I came back, she said that Alphonso would admit to his part in the robbery.

(N.T. Trial 43–44.)

Nevertheless, Alphonso never made a statement to the police, and he was never arrested or tried for the robbery of Mr. Really.[3]

---

3. Appellant was represented by different Assistant Defenders at the preliminary hearing, trial, and post-trial argument. However, other details of appellant's representation are not so clear. I cannot agree with the majority's conclusions that "appellant's counsel [at appellant's preliminary hearing] suggested that Alphonso was going to admit that he had committed the crime with which appellant was charged," majority opinion at ——, and that "before Alphonso could be approached regarding a statement, *a second, unidentified (in the record before us) Assistant Defender* advised Alphonso not to make any statement relating to the robbery of Mr. Really." Majority opinion at —— (emphasis added). The record does not show whether the Assistant Defender who implicated Alphonso was the same Defender who represented appellant at his preliminary hearing. Nor is it clear whether the

Mrs. Westbrook, the mother of Alphonso and appellant, testified that at the time of the preliminary hearing, Alphonso told her that "James was not the one who robbed the oil man, said it was him and three more guys, at 13th and Bainbridge Sts." (N.T. Trial 61.) She also testified that Mr. Really said to her after seeing Alphonso: " . . . that's the one who robbed me. If they brought him out before they brought the other boy out, I would have identified Alphonso." (N.T. Trial 63.) However, this was contradicted by Mr. Really, who, on redirect, persisted in his identification of appellant:

Q. —Who was it who robbed you that day?

A. James.

Q. Did you tell the detective that?

  .      .      .      .      .      .      .      .

A. Yes.

Q. Did you tell him that after you saw Alphonso?

A. Yes.

(N.T. Trial 57.)

Scott Wilson, the social worker, testified that he had interviewed appellant in the presence of Alphonso and that appellant had told him that "I have my brother here now. I brought him down because of what I told you about him doing what I am accused of." (N.T. Trial 79.) Mr. Wilson testified that he then telephoned the Defender, because "I thought there was enough substance to what James had told me to contact somebody that would be representing James Westbrook when he went to court." (N.T. Trial 80.) On cross-examination, however, he admitted that he had acted as he had only because he was impressed with appellant's sincerity, not

Assistant Defender who advised Alphonso not to make a statement was the person who had implicated him. Detective Bonsera refers only to "the Public Defender," N.T. Trial 43, and "The Public Defender's Office," N.T. Trial 45.

because Alphonso had made any admission in his presence or because he had any direct knowledge of the circumstances of the case.

No testimony was offered to prove that Alphonso had admitted his role in the robbery to anyone other than his mother and appellant. Detective Bonsera, in his direct testimony, said that "[p]rior to his mother speaking to him, I asked if he did participate in the robbery, and he said no. I asked if he was going to admit to it, and he said no." (N.T. Trial 48.) [4]

From this record it is evident that a written statement from Alphonso, taken by the police, or his testimony at appellant's trial, or at least his appearance at the trial, so that the trial judge and Mr. Really could have assessed his similarity to appellant, might have been of decisive importance to appellant's defense that it was Alphonso, not he, who had robbed Mr. Really.

As the majority notes, the cases in which a conflict of interest due to dual representation has been found have dealt with situations where either co-defendants or defendants charged with the same offense but tried separately have, despite the existence of antagonistic defenses, been represented by the same attorney or by members of the same law firm. *Commonwealth v. Wilson,* 429 Pa. 458, 240 A.2d 498 (1968); *Commonwealth ex rel. Whitling v. Russell,* 406 Pa. 45, 176 A.2d 641 (1962). Here, Alphonso has never been arrested or charged with the offense that was the subject of the trial of appellant, his brother. Nevertheless, I believe that a conflict of interest did exist at appellant's trial, and that therefore his conviction should be reversed and a new trial awarded.

4. Alphonso did, however, testify at appellant's PCHA hearing. There, when asked if he had committed the robbery for which his brother had been found guilty, he responded: "No, I did not." (N.T. PCH 56.)

The law on conflict of interest was recently summarized in *Commonwealth v. Breaker,* 456 Pa. 341, 318 A. 2d 354 (1974), as follows:

First, "[i]f, in the representation of more than one defendant, a conflict of interest arises, the mere existence of such a conflict vitiates the proceedings, even though no *actual* harm results. The potentiality that such harm *may* result, rather than that such harm *did* result, furnishes the appropriate criterion [citation omitted]." Second, a defendant must demonstrate that a conflict of interest actually existed at the trial because "dual representation alone does *not* amount to a conflict of interest [citations omitted]." Third, "[t]o make the dual representation arise to a true conflict, appellant need not show that actual harm resulted, . . . but must at least show the possibility of harm . . .. [citation omitted]." Fourth, appellant will satisfy the requirement of demonstrating possible harm, if he can show, inter alia, "that he had a defense inconsistent with that advanced by the other client, or that counsel neglected his case in order to give the other client a more spirited defense [citations and footnote omitted]."

*Id.* at 344, 318 A.2d at 356.[5]

**5.** It is also important to consider the ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, § 3.5 ("Conflict of Interest") (Approved Draft, 1971):

(b) "Except for preliminary matters such as initial hearings or applications for bail, a lawyer or lawyers who are associated in practice should not undertake to defend more than one defendant in the same criminal case if the duty to one of the defendants may conflict with the duty of another. The potential for conflict of interest in representing more than one defendant is so grave that ordinarily a lawyer should decline to act for more than one of several co-defendants except in unusual situations when, after careful investigation, it is clear that no conflict is likely to develop and when the several defendants give an informed consent to such multiple representation.

*See also* the commentary to that Standard, providing *inter alia*:

In many instances, a given course of action may be advantageous to one of the defendants but not necessarily to the other

From this statement of the law, the following may be deduced. "Conflict of interest" may arise from "dual representation." "Dual representation" is composed of two elements: (1) representation by the same counsel, or by members of the same law firm, or (2) "more than one defendant." If the second element is confined to its literal terms, then the majority is correct that there was no dual representation in the present case, since Alphonso was never a "defendant." However, I suggest there is no defensible reason for such a limitation of the definition of the element "more than one defendant." Rather, the element should be defined and applied by reference to the right to be safeguarded, *i. e.*, the "right to be represented by counsel unburdened by any conflict of interest." *Commonwealth v. Breaker, supra* 456 Pa. at 343, 318 A.2d at 355. In this sense the element of "more than one defendant" and the presence of a "possibility of harm" merge into one question: Did the representation of two clients (by one attorney, or by members of the same law firm) import into a defendant's trial a possibility of harm sufficient to amount to a conflict of interest?

When the criteria of *Commonwealth v. Breaker, supra,* are applied, the first question becomes whether appellant has shown the existence of the first element of "dual representation," or, to define the question as required by the facts of this case: Must Assistant Defenders from the same Defender Association be considered "lawyers who are associated in practice," ABA Standards § 3.5, *supra* n. 5? If so, must they adhere to the same standards governing conflicts of interest in private practice? The issues raised by these questions do not appear to have been addressed in a case involving a conflict of interest. Nevertheless, we are not without guidance.

> . . . . The weaker defense may often detract from the stronger, and a lawyer may find that to assert a point vigorously for one client operates to disparage the other or to put him in a bad light. Such situations underscore the need for separate representation . . . ."

See also ABA Code of Professional Responsibility DR 5–105.

In *Commonwealth v. Via*, 455 Pa. 373, 316 A.2d 895 (1974), appellant claimed in his second PCHA petition that the Assistant Defender who had represented him at trial and the Assistant Defender who had represented him at his first PCHA hearing (both from the Dauphin County Public Defender's Office) had been ineffective. In holding that appellant had not waived his right to raise this issue because he had not raised it at the first PCHA hearing, the Supreme Court noted that appellant had been represented by the "same firm":

> However, here, during the first PCHA proceeding, appellant was assigned counsel who was a member of the same firm that represented him at trial. We will not view the failure to raise a claim of incompetency as a waiver where an individual in the subsequent proceeding is represented by the same counsel or one of his associates. The law will not assume that counsel has advised his client of his inadequacies or those of his associates.

*Id.* at 377, 316 A.2d at 898.

*Accord, Commonwealth v. Bliss*, 239 Pa.Super. 347, 361 n. 8, 362 A.2d 365, 373 n. 8 (1976).

If Assistant Defenders are to be considered members of the "same firm" in cases involving a claim of ineffectiveness, there is no reason to establish a different rule for cases involving a claim of conflict of interest.

Nor is there any reason to distinguish between a public firm, such as the Defender Association, and a firm engaged in private practice. Indeed, important constitutional considerations argue against such a distinction. Since *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), "the scope of judicially mandated representation of the poor [has] increased dramatically." *Defender Association of Philadelphia Amendment of the Articles of Incorporation*, 453 Pa. 353, 356, 307 A.2d 906, 908 (1973). *See, inter alia, Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); *Coleman*

*v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); *Mempa v. Rhay,* 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1969); *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). The right to counsel's assistance necessarily means the right to effective assistance. *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). To hold that there should be higher standards for determining when a conflict of interest arises in a private firm than when it arises in the legal office charged with the primary responsibility of representing indigent accused would undercut this constitutional mandate and discriminate among clients on the basis of their ability to pay. "Such differing standards, depending on wealth, when dealing with the fundamental right to counsel, are prohibited by the Constitution." *Defender Association, supra* 453 Pa. at 375, 307 A.2d at 917 (dissenting opinion by Roberts, J.). *See also Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); ABA Project on Standards for Criminal Justice, Standards Relating to Providing Defense Services (Approved Draft, 1968); *Equal Justice for the Accused,* Report of the Special Committee of the Association of the Bar of the City of New York and the National Legal Aid and Defender Association (1959).

Indeed, because indigent defendants have more limited alternatives available to them, a conflict of interest may be even more destructive when it involves the Defender rather than private practice. "[E]ven after full disclosure of the possible conflict of interest, the indigent defendant has no alternative but to accept the representation of the Defender Association. Such a conflict, which surely would not be tolerated by a non-indigent defendant, will be unavoidable and undoubtedly acquiesced in by the indigent, having no other recourse." *Defender Association, supra* 453 Pa. at 375, 307 A.2d at 917 (dis-

senting opinion by Roberts, J.).[6]  In this regard, it is of interest to note the testimony of appellant's trial counsel at the PCHA hearing, when he evaluated his conduct of appellant's trial:

> Part of the case that has upset me the most was that a Public Defender at the police station was appointed for Alphonso Westbrook.  When I went to trial I did not know of this conflict of interest  .  .  .. At the time we had the trial, I did not know, because it was not in the file, it should have been, that there was a conflict that we represented not only a brother but a person who had come forth and stated that he and

**6.**  *See also* Webster, The Public Defender, the Sixth Amendment, and the Code of Professional Responsibility, 12 Am.Crim.L.Rev. 739, 741–43 (1975):

> It has long been true, under numerous decisions both of ethics committees and of courts, that if one lawyer, whether he be an associate or partner, is ethically precluded from representing a particular client or urging a particular view by reason of a conflict of interest, no lawyer in that firm may do so.  .  .  .
> The question remains as to whether the public defender service ought to be treated as a private law firm for the purpose of determining the appropriate action where conflicts of interest are truly present.  It might be argued that there are no conflicts of interest questions in the public defender context because of the absence of economic interest in challenging or refraining from challenging the conduct of trial counsel.  However, this view completely ignores the fact that the same subtle but real non-economic pressures present in private practice are equally operative in a public defender service.  .  .  .  By their nature, the non-economic conflicts—friendship, loyalty, pride, fear of ostracism or retaliation—operate with equal vigor on the individual lawyer in the public firm.  It is he who feels the conflict, not the form of his law association, upon whom the ethical considerations must prevail.  .  .  .  In short, for the purpose of applying the maxim that if one lawyer is disqualified then all the lawyers in the "firm" are disqualified, the concept of "firm" encompasses a partnership, an association of individuals which looks to the public like a partnership, a prosecutor's office, a neighborhood legal services program, a legal aid society, a legal services corporation, and a public defender service.

three other people . . . were involved in this case . . . .

. . . . . . . .

I've always looked at the Defender's Association as a law firm, perhaps a special law firm. Every member of that office represents that law firm when they represent a client. I feel that Mr. Westbrook was not properly represented.

. . . . . . .

If I had known at the time of trial that my office represented Alphonso Westbrook, a letter would have immediately gone out to the Court Administrator withdrawing our representation of the defendant.

. . . . . . .

A memo from the assistant who represented Alphonso Westbrook should have been in the defendant's file. I should have been notified of this before trial. I was not.

(N.T. PCH 14-15, 24-26.) [7]

I recognize that the constantly increasing caseload of the Defender Association imposes a heavy burden upon every Assistant Defender. From July, 1973, through June, 1974, the Defender Association disposed of over 57,000 cases in the state courts; the comparable figure for 1972-73 was 54,000 cases. Defender Association of Philadelphia, 39th and 40th Annual Reports of the Directors (1972-1973 and 1973-1974). However, the volume

7. Large private law firms routinely cross-check their files before accepting new clients so as to avoid potential conflicts of interest. Had the Assistant Defender (or Defenders) who represented appellant and Alphonso at the preliminary hearing noted in Alphonso's and appellant's respective files that Alphonso might have committed the robbery with which appellant was charged, both trial counsel and post-trial counsel would have been alerted to the existence of a conflict.

Trial counsel explained at the PCHA hearing that the Defender Association's appeal files are kept separate from the Common Pleas files. N.T. PCH 23. Apparently there was no routine office procedure for trial and post-trial counsel to learn of possible conflicts or to ascertain that an appeal had been filed.

of the Defender's work cannot be used as an excuse for a failure to meet constitutionally imposed standards of competent representation; indeed, it makes the effective advocacy required by our cases even more essential.[8] *See generally Suggs v. United States,* 129 U.S.App.D.C. 133, 391 F.2d 971 (1968).

Once it is established that the first element of dual representation existed, the remaining question is whether the representation of two clients imported a possibility of harm sufficient to amount to a conflict of interest. Under the facts of the present case I think such a possibility of harm has been shown. This may best be illustrated by a comparison of the possible harm here with the possible harm found in other dual representation cases.

In *Commonwealth ex rel. Whitling v. Russell, supra,* two brothers were charged with sodomy. At their joint trial, the judge requested that counsel for appellant also represent appellant's brother. Counsel acceded to the request. However, the defense appellant offered was to claim innocence and to say that his brother was guilty. The Supreme Court held that given these facts, a true conflict existed in the dual representation of the two defendants. In *Commonwealth v. Meehan,* 409 Pa. 616, 187 A.2d 579 (1963), appellant was convicted of robbery. He and his co-defendant were tried two times; at the second trial both were represented by the same Assistant Defender. Although the complainant had first identified the co-defendant as the robber, at the second trial he

---

8. One writer has remarked:
    Many defenders are assigned unrealistic case loads which place such a burden on him that he is physically unable to devote adequate time to each individual indigent. This has led to the complaint increasingly heard from defendants who, after their conviction, in response to the question, ".  .  . [W]ere you represented by defense counsel?" answered "No, I was represented by a public defender."

    Friloux, Equal Justice Under the Law, 12 American Criminal L. Rev. 691, 702.

identified appellant. The Assistant Defender, however, did not call this prior identification to the attention of the court. This court affirmed the conviction, but the Supreme Court reversed on the basis of Judge FLOOD's dissenting opinion, 198 Pa.Super. 558, 567, 182 A.2d 212, 217 (1962), because "under these circumstances, we cannot say that an attorney free of the responsibility of representing McKnight as well as Meehan, would not have used these facts to the advantage of Meehan and the disadvantage of McKnight." 198 Pa.Super. at 571, 182 A. 2d at 219. Perhaps even closer in point is *Commonwealth v. Booker*, 219 Pa.Super. 91, 280 A.2d 561 (1971). There, appellant and a co-defendant were jointly tried for aggravated robbery. At trial, one of the arresting officers testified that before the arrest, one defendant had tried to blame the theft on the other. We wrote:

> In the instant case appellant has shown a conflict of interest. As soon as the police officer testified that one defendant tried to blame the theft on the other defendant, it became obvious that the defendants had antagonistic defenses. It became impossible for counsel to represent both defendants fully and faithfully. *Id.* at 94, 280 A.2d at 562.

Here, although appellant and his brother Alphonso were not co-defendants at trial, their "defenses"—in the sense of their interests and the legal advice each was entitled to receive from his attorney—were antagonistic. This became apparent as soon as Detective Bonsera testified. The detective's testimony has been stated in some detail above. To recall it briefly: Appellant was represented by one Assistant Defender at his preliminary hearing. At the preliminary hearing, that Defendant, or possibly another Defender, brought to the detective's attention the possibility that Alphonso rather than appellant might have committed the robbery; also, that Defender, or possibly another Defender, then advised Alphonso not to make a formal statement to the police.

While these events did not occur at the trial, they may well have determined its outcome.[9]  At trial, the Assistant Defender argued that Alphonso was guilty of the robbery, not appellant.  However, the advice that had been given Alphonso by the Assistant Defender he had consulted at the preliminary hearing had evidently prevented Alphonso being charged with the robbery.  This advice was in direct conflict with effective representation by the Defender of appellant.  It was in the interest of appellant that Alphonso make a statement to the police, which might well have led to his arrest, and that he be present at appellant's trial to testify, or at least to be seen.

True, we cannot be certain what Alphonso's statement or testimony would have been, or how his appearance might have affected the trial.  However, it is the "potentiality that such harm [*i. e.*, harm arising from a conflict] *may* result, rather than that such harm *did* result, [that] furnishes the appropriate criterion." *Commonwealth v. Breaker, supra, citing Commonwealth ex rel. Whitling v. Russell, supra* 406 Pa. at 48, 176 A.2d at 643.  We need not determine the exact quantum of harm.  *Commonwealth v. Wilson, supra.*  The right to effective assistance of counsel "is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942).  As in *Commonwealth v. Booker, supra,* "[a]s soon as the police officer testified . . . it became

---

9.  The ABA Standards, § 3.5, supra note 5, exclude dual representation at initial hearings from the general prohibition against dual representation.  However, as this case amply illustrates, dual representation at preliminary hearings may in certain circumstances develop into a conflict of interest.  Here the Defender Association represented appellant at his preliminary hearing and at trial.  Therefore, the conflict represented by appellant's and Alphonso's antagonistic defenses did not terminate after the initial hearing, but continued through appellant's trial.

obvious that the [brothers] had antagonistic defenses." *Id.* 219 Pa.Super. at 94, 280 A.2d at 562. As soon as the detective testified here, the Assistant Defender should have asked to be allowed to withdraw as appellant's counsel; at the very least he should have requested a continuance so as to determine whether the Defender Association still represented Alphonso. He did neither.

I would reverse the order of the lower court, vacate the judgment of sentence, and order a new trial.

WATKINS, President Judge, and HOFFMAN, J., join in this opinion.