370 A.2d 322
**COMMONWEALTH of Pennsylvania**
**v.**
**Thomas HILLIARD, Appellant.**
Supreme Court of Pennsylvania.
Argued June 24, 1975.
Decided Feb. 28, 1977.

320

Nolan N. Atkinson, Jr., Zack, Myers & Atkinson, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., James J. Wilson, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

PER CURIAM.

A majority of the Court agrees that the judgment of sentence should be reversed and a new trial granted.

Mr. Justice Roberts files an Opinion Announcing the Judgment of the Court, stating two grounds for reversal and grant of a new trial. Mr. Justice O'Brien joins Part II of the Opinion Announcing the Judgment of the Court. Mr. Justice Nix joins Part I of the Opinion Announcing the Judgment of the Court. Mr. Justice Manderino joins Parts I and II of the Opinion Announcing the Judgment of the Court.

Mr. Justice EAGEN files a Dissenting Opinion in which Mr. Chief Justice JONES and Mr. Justice POMEROY join; Mr. Justice NIX joins in Part V of this Dissenting Opinion.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

ROBERTS, Justice.

Appellant is entitled to a new trial for at least two reasons. First, a statement taken from appellant, the product of interrogation to which counsel was denied access, was admitted at trial. Second, appellant's request for an instruction on voluntary manslaughter was denied.

### I

The interrogation of appellant, while he was in custody at the Police Administration Building in Philadelphia, began at 1:30 p. m. December 26, 1972. Appellant's wife contacted the Defender's Association to obtain counsel for him. An Assistant Defender arrived at the Police Administration Building, and requested to see appellant, at 2:15 p. m. He was told appellant was not being held. He asked again at 3:00 p. m., and at 3:20 p. m. Both times counsel was told appellant was not there. When he returned at 3:40 p. m., he was finally told that appellant was there, but did not want to see an attorney. The interrogation continued until 4:00 p. m. Counsel was afforded no opportunity to see appellant until 8:00 p. m.

 The statement taken from appellant during this interrogation should not have been admitted at trial. A statement taken during custodial interrogation, without a valid waiver of counsel, cannot be admitted against a defendant at trial. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

 If counsel has expressed a desire to be present during interrogation, a waiver of counsel obtained in counsel's absence should be held invalid as a matter of law. *Commonwealth v. Hawkins,* 448 Pa. 206, 220, 292 A.2d 302, 309 (1972) (Dissenting Opinion of Nix, J., joined by Roberts and Manderino, JJ.). Appellant's failure to request counsel, when his attorney has been denied access and appellant has not been informed of his attorney's availability, cannot support a determination that he has waived his right to counsel. *Commonwealth v. Yates,* 467 Pa. 362, 366, 357 A.2d 134, 136 (1976) (Dissenting Opinion of Roberts, J., joined by Nix and Manderino, JJ.).

 This view is in accord with the rule adopted by the New York Court of Appeals: once counsel has undertaken to represent a defendant, the defendant cannot waive his right to counsel in custody unless counsel is present. *People v. Hobson,* 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976). As Chief Judge Breitel wrote in the opinion of the court:

> "The rule that once a lawyer has entered the proceedings in connection with the charges under investigation, a person in custody may validly waive the assistance of counsel only in the presence of a lawyer breathes life into the requirement that a waiver of a constitutional right must be competent, intelligent and voluntary. Indeed, it may be said that a right too easily waived is no right at all."

Id. at 484, 384 N.Y.S.2d at 422, 348 N.E.2d at 898 (1976) (Citations omitted).

The principle that a denial of counsel requires suppression of a defendant's statement applies regardless whether the denial resulted from an "honest mistake" by the police. The focus must be on the rights of the accused, not the innocence or culpability of the police. Cf. *United States v. Agurs*, 427 U.S. 97, 109, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342, 353 (1976) ("Nor do we believe the constitutional obligation is measured by the moral culpability or the willfulness of the prosecutor."); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963) (Denial of appellant's constitutional right entitles him to a new trial "irrespective of the good faith or bad faith of the prosecution.").

Moreover, while the conduct of the police in denying counsel access to appellant may initially have resulted from an honest mistake, their subsequent actions reflect a lack of concern for the rights of the accused. Counsel's repeated efforts to see appellant should have put the police on notice that appellant might have been at the Police Administration Building. Advising counsel that appellant did not want to see him, when appellant had not been informed that his attorney was available, was inexcusable. Such mistakes cannot justify a denial of the appellant's constitutional rights.

## II

Appellant's conviction should also be reversed because the trial court refused to instruct the jury on voluntary manslaughter. Failure to grant appellant's requested instruction denied him due process. *United States ex rel. Matthews v. Johnson*, 503 F.2d 339 (3d Cir. 1974), cert. denied, 420 U.S. 952, 95 S.Ct. 1336, 43 L.Ed.2d 430 (1975); *Commonwealth v. Cain*, 471 Pa. 140, 171, 369 A.2d 1234, 1250 (1977) (Opinion in Support of Reversal) (Opinion of Roberts, J., joined by O'Brien and Manderino, JJ.). This due process right to a requested voluntary manslaughter instruction should be ap-

plied to all defendants whose convictions were on direct appeal at the time *Matthews* was decided. *Commonwealth v. Cain*, 471 Pa. 140, 171, 369 A.2d 1234, 1250 (1977) (Opinion in Support of Reversal) (Opinion of Roberts, J., joined by O'Brien and Manderino, JJ.).

Judgment of Sentence reversed and a new trial granted.

O'BRIEN, J., joins Part II of this Opinion.

NIX, J., joins Part I of this Opinion.

MANDERINO, J., joins Parts I and II of this Opinion.

EAGEN, Justice, dissenting.

Appellant, Thomas Hilliard, was convicted by a jury of murder of the first degree, aggravated robbery, conspiracy, assault and battery, and aggravated assault and battery. Following the denial of post-verdict motions a sentence of life imprisonment was imposed on the murder conviction. Prison sentences were also imposed on the robbery conviction (10–20 years), the conspiracy conviction (1–2 years), and the assault and battery convictions (1½–3 years).[1] Hilliard filed a direct appeal to this Court from the judgment of sentence on the murder conviction. The judgments of the sentence on the other convictions were appealed to the Superior Court, which certified that appeal to this Court.

Hilliard asserts seven trial errors which he urges require a reversal of the judgments and the grant of a new trial.[2] I would affirm the judgments of sentence.

1. The right of the court to impose a sentence on each conviction is not challenged.

2. Hilliard did not file written post-verdict motions as required by Pa.R.Crim.P. 1123(a), and *Commonwealth v. Blair*, 460 Pa. 31, 331 A.2d 213 (1975). I would nevertheless consider the merits of his claims because the relevant events of the instant case took place before *Blair* served notice of the requirement of compliance with

The sufficiency of the evidence to warrant the jury's findings of guilt is not challenged; nonetheless, I have carefully studied the record and determined it establishes the following: On December 23, 1972, at approximately 1 a. m., two men entered Cassidy's Bar at Ninth and Venango Streets in Philadelphia. One of the men was masked and armed with a shotgun. The other man, who was not masked and who was later identified by three eyewitnesses as Hilliard, drew a revolver, jumped behind the bar and at gunpoint ordered the bartender, John Cassidy, to open the cash register and to get a bag. As Cassidy secured a bag, Hilliard picked up a pistol which Cassidy kept behind the bar and then directed Cassidy to put the money from the cash register into the bag. At the same time the man with the shotgun attempted to take money out of the trouser pocket of one Lee Hicks, a patron of the bar, after having already taken Hicks' wallet. Hicks, however, resisted violently. He grabbed the shotgun and a struggle ensued between Hicks and the masked gunman. As these two fought, another patron, William Coates, began throwing bar stools at Hilliard behind the bar. After Coates had thrown three or four stools, Hilliard fired two shots at him and moved from behind the bar in his direction. Coates and Hilliard began grappling and at one point during their combat they were facing each other with Coates attempting to subdue his opponent by squeezing him in bearhug fashion. Hilliard, however, had his arms free and he placed his revolver at Coates' back and pulled the trigger. Coates died from the resultant gunshot wound. Hilliard then stepped away from the fallen Coates and almost immediately was confronted by the cook at Cassidy's Bar, Richard Ray. When Hilliard ordered him to get out of the way, Ray grabbed at Hilliard's weapon and Hilliard shot

Rule 1123(a) and because the trial court apparently condoned the non-compliance with Rule 1123(a) by passing upon the merits of the issues raised orally. *Commonwealth v. Bailey,* 463 Pa. 354, 344 A.2d 869 (1975).

326

him in the stomach. While Hilliard and Coates strug-
gled, Hicks, with the aid of several other patrons, wrest-
ed the shotgun away from the masked man and began
beating him with it. At this point in the fracas, a third
gunman, who apparently had been stationed at the door,
stepped into the bar and fired a number of shots at the
group beating the masked man. The three gunmen then
ran out of the bar. Cassidy took a rifle from under the
bar and fired two shots· at Hilliard before the rifle
jammed. After the fleeing gunmen were out of the bar
Cassidy ran to a side door and fired at least three more
shots in the direction of their flight. The three gunmen
escaped in a white Pontiac driven by a fourth man. The
entire incident lasted about five minutes.[2A]

Hilliard's defense was as follows: On the evening of
the incident he was in the company of Larry Bennett,
Robert Lee Rowe, and a man samed Sonny and the four
decided to "get some beer." Hilliard admitted entering
Cassidy's Bar but maintained that he was unaware that
a robbery was going to take place. Upon entering the
saloon Hilliard approached the bar and ordered a glass
of beer. Sonny entered the bar behind Hilliard with a
shotgun and announced the holdup. Although taken by
surprise, Hilliard noticed Cassidy moving for a gun be-
hind the bar. Hilliard reached over the bar, seized Cas-
sidy's pistol, put it in his pocket, and ran for the door.
While fleeing Hilliard was shot. Although Hilliard had
his own revolver in his pocket when he entered Cassidy's
he maintained that he did not withdraw this weapon
from his pocket and did not at any time fire either his
own or Cassidy's pistol.

2A. Since the relevant events occurred at a time when felony mur-
der constituted murder of the first degree, Act of June 24, 1939,
P.L. 872, § 701, December 1, 1959, P.L. 1621, § 1, 18 P.S. § 4701,
there can be no doubt the evidence was sufficient to sustain the
jury's findings.

## I

During the investigation of the criminal incident at Cassidy's the police searched Hilliard's apartment at 1402 West Erie Avenue in Philadelphia and seized certain items which were admitted into evidence at trial. Hilliard's pretrial motion to suppress these items was denied after a suppression hearing and Hilliard now asserts that the suppression court's ruling was erroneous.

Considering " 'only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.' " *Commonwealth v. Johnson,* 467 Pa. 146, 354 A.2d 886, 889 (1976), quoting *Commonwealth v. Goodwin,* 460 Pa. 516, 523, 333 A.2d 892, 895 (1975), the following facts were established at the suppression hearing:

Detective Francis McGurk went to Cassidy's Bar on December 23, 1972, to investigate the shooting-robbery incident. He arrived at about 1:50 a. m. and began interviewing witnesses. He learned that at least three men were involved in the crime and that they used a 1963 or 1964 white Pontiac to aid their escape. The man who shot Coates was described as "being possibly 30, big shoulders, broad shouldered, with a mustache, wearing a brown corduroy coat and a hat." The second man was described as "around 25 to 30, thin build, around five foot eight, wearing a long black leather coat, and he has a ski mask pulled over his face." Both men were black. McGurk also learned that the bartender shot at the robbers as they fled, specifically at the man who shot Coates and Ray, and that some of the patrons had taken a shotgun away from the man wearing the ski mask and had beaten him with it. McGurk had this information broadcast over the police radio and also relayed back to police headquarters. Detective McGurk also learned that the man

wearing the brown corduroy coat had taken a .25 caliber pistol with a specific serial number from the bartender.

At approximately 1:40 a. m. Officer Robert Morton was at Frankford Hospital in Philadelphia on police business unrelated to the instant case. He observed a wounded man (whom he identified at the suppression hearing as Hilliard) arrive at the hospital in a 1964 white Pontiac with one other black male and two females. Hilliard approached Morton and related that he had been accidentally shot, but did not want to prosecute the person who shot him. Morton informed him that all gunshot wounds had to be reported to the police and then instructed one of the hospital employees to request the police to send someone to make a report on Hilliard's gunshot wound. Morton left Frankford Hospital at approximately 2:10 a. m. and after leaving, Morton and his partner heard the radio message reporting the incident at Cassidy's Bar. Realizing that the description of the suspects and the getaway car matched those he observed at the hospital, Morton called in his observations and then returned to the hospital. Hilliard could not, however, be found.[3] Morton obtained the admission slip which had been filled out for Hilliard and which identified him as John Williams of 4524 North Bouvier Street. The slip was signed by a woman who gave her name as Doris Williams of the same address. This information was relayed to Detective D'Alverez Bethel at headquarters who had the Bouvier Street address checked out. A man was picked up at that address and this man informed the police that a Doris Williams lived at that address, but that she had gone out shortly before midnight in a light-colored car with three black men and that she had mentioned going to 1402 West Erie Avenue. Detective Bethel contacted Detective McGurk at approximately 5 a. m. with this information.

3. Hilliard was subsequently located at our Lady of Lourdes Hospital in Camden, New Jersey by the Philadelphia police in cooperation with the Camden Police.

Detective McGurk went to 1402 West Erie Avenue at approximately 5:30 a. m. without a warrant. The address was that of an apartment building with a first floor entrance leading into a vestibule. McGurk entered the vestibule and encountered a second door with a large window leading into the building proper. McGurk observed through this window a brown corduroy coat lying on the floor beside the doorway of the first floor apartment. Lights were on in the vestibule, the first floor hallway, and the apartment itself, and the apartment door was wide open. McGurk opened the vestibule door and entered the hallway. He knocked on the door and announced the presence of police, but received no response. McGurk then entered the apartment, stopping to examine the brown corduroy coat which was lying on the floor. Examination of the coat revealed a hole with a reddish stain in the left armpit area. McGurk proceeded into the apartment in search of the suspects. In the bedroom McGurk observed a chest of drawers with the top drawer open about three inches through which the butt of a revolver was visible. McGurk opened the drawer completely and found not only the revolver he first observed but also a .25 caliber pistol, the serial number of which matched the number of the weapon taken from Cassidy's Bar. In the living room McGurk found a long-sleeved black turtleneck sweater and a T-shirt lying on a table. Each of these garments had a hole in the left armpit area.

The defense attempted to show at the suppression hearing that both the apartment door and the vestibule door were locked at the time the search took place. The inference to be drawn was that the police entry was forcible and did not take place as Detective McGurk testified. The suppression court resolved the conflict in the testimony in favor of the Commonwealth.

The corduroy coat, the two guns, the sweater and the T-shirt were all seized by McGurk and admitted into evidence at Hilliard's trial.

The plain view doctrine has been recognized as part of the Pennsylvania law of search and seizure, *Commonwealth v. Davenport,* 453 Pa. 235, 308 A.2d 85 (1973), and the rule of that doctrine is that "objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968) (citations omitted). See also *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Commonwealth v. Jeffries,* 454 Pa. 320, 311 A.2d 914 (1973). In the instant case Hilliard concedes that there was probable cause to believe one of the suspected perpetrators of the robbery and shooting was present at 1402 West Erie Avenue. Hilliard focuses his attack on the "plain view" aspect of the exception and does not challenge the lawfulness of the police presence in the apartment.[4] The thrust of his argument is that the po-

---

4. Hilliard does not raise the issue of whether the police officers' determination of probable cause that one of the suspects was present at the premises was alone sufficient to justify entry of the apartment without a search warrant. Indeed, the issue of whether a judicial determination of probable cause to believe a suspect is present, i. e., a warrant, is required to justify entry of a residence for the purpose of arresting a suspect is a significant and open question. See *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 825 n. 6, 46 L.Ed.2d 598 (White, J., Opinion of the Court), at 433, 96 S.Ct. at 832 (Stewart, J., concurring), (Powell, J., concurring) (1976); *Jones v. United States,* 357 U.S. 493, 499–500, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958). But see *United States v. Watson,* supra, 423 U.S. at 452, 96 S.Ct. at 842 (Marshall and Brennan, JJ., dissenting).

A strong argument can be made that the entry of a residence to effect an arrest is a search within the purview of the Fourth Amendment and that a warrant is generally required before a police officer may enter a home to effect an arrest. See, e. g., *People v. Ramey,* 16 Cal.3d 263, 127 Cal.Rptr. 629, 545 P.2d 1333 (1976); *Commonwealth v. Forde,* Mass., 329 N.E.2d 717 (1975); Note, "The Neglected Fourth Amendment Problem in Arrest Entries," 23 Stan.L.Rev. 995 (1971). But see ALI, Model Code of Pre-Arraignment Procedure, Proposed Official Draft § 120.6, Text and Commentary (1975).

Assuming arguendo a general warrant requirement, and although the warrantless entry in the instant case was not made in "hot pursuit", *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18

lice abandoned their search for the suspects and concentrated on a search for evidence of the crime. While it is true that the seized objects must not have been in plain view as a result of unlawful police conduct for this doctrine to apply, *Commonwealth v. Jackson*, 461 Pa. 632, 337 A.2d 582 (1975); *Commonwealth v. Jeffries,* supra, there is nothing in the record to sustain such a conclusion. The challenged items of evidence were, according to the suppression hearing record, clearly in the plain view of the police officers and I am not persuaded that the suppression court's ruling was in error.

## II

At trial Hilliard was identified by three eyewitnesses, two of whom identified him as the man who shot Coates. In addition, the Commonwealth introduced a statement during its case in chief made by Hilliard to Detective Thomas Brown at our Lady of Lourdes Hospital in Camden, New Jersey,[5] and introduced a statement on rebuttal

L.Ed.2d 782 (1967), a sound argument can be made for its justification. Considering that a violent crime had been committed; that the suspect was reasonably believed to be wounded, armed and dangerous; that probable cause clearly existed to believe this suspect committed the crime; that probable cause existed to believe the suspect was on the premises entered; that the entry was non-forcible; that the inherent mobility of the suspect suggested a likelihood of escape. *United States v. McKinney*, 379 F.2d 259 (6th Cir. 1967); and that the entry was made in the early morning hours when obtaining a warrant was impracticable, ** the warrantless entry in the instant case can be justified under the rubric of "exigent circumstances." *Dorman v. United States,* 140 U.S.App.D.C. 313, 435 F.2d 385 (1970). See also *United States v. Shye,* 492 F.2d 886 (6th Cir. 1974); *United States v. Davis,* 461 F.2d 1026 (3d Cir. 1972); *Vance v. North Carolina,* 432 F.2d 984 (4th Cir. 1970); *United States v. Cognato,* 408 F.Supp. 1000 (D.Conn.1976); *State v. Lasley,* Minn., 236 N.W.2d 604 (1975); *State v. Johnson,* Iowa, 232 N.W.2d 477 (1975).

** The fact that the entry was made at night (early a. m.) cuts both ways. Although the late hour may, as indicated, underscore the impracticability and delay of obtaining a warrant, it also raises particular concern over the reasonableness of the entry. *Dorman v. United States,* supra.

5. The substance of the statement taken by Brown was that Hilliard and Robert Lee drove to Sonny's house on the night of De-

made by Hilliard to Detective McGurk at the Philadelphia Police Administration Building.[6]

Prior to trial Hilliard's motion to suppress these statements was denied. Hilliard presently challenges the correctness of this ruling with respect to the statement taken by Detective McGurk. He maintains this particular statement should have been declared involuntary as a matter of law and evidentiary use thereof proscribed.[7]

Considering "only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted," *Commonwealth v. Johnson,* su-

cember 22, 1972; that Sonny said he was going to rob a bar and solicited their help; that Hilliard, Larry Bennett, Robert Lee and Sonny drove to a bar at Eighth and Venango [Cassidy's]; that Sonny was armed with a shotgun; that Larry had a .38 caliber weapon; that Hilliard had a .22 caliber weapon; that Larry, Sonny and Hilliard entered the bar with their weapons drawn; that Hilliard ran behind the bar and secured the bartender's weapon; that someone started throwing chairs at Hilliard and then a white man grabbed him in an attempt to take his gun away; that Hilliard "reached over his shoulder and shot the gun"; that Hilliard started to run out of the bar, but another man tried to block his way; that Hilliard did not know if he shot the gun again or not; that more shots were fired as he ran out of the bar; that Hilliard was hit in the left shoulder with a shot during his flight; that they all ran to Robert Lee's car, a 1964 white Pontiac, and drove away.

6. The substance of the statement taken by McGurk was that on the night of December 22, 1972, Hilliard and Robert Lee drove to Sonny's house; that Sonny and Larry stated they were planning on "getting this bar" and asked if Hilliard was going with them; that Hilliard indicated he was; that they drove to the bar at Ninth and Venango; that Sonny gave Hilliard a .22 caliber pistol and Larry a .38 caliber weapon and armed himself with a shotgun; that when they entered the bar Sonny had the shotgun "together" and Larry had his .38 caliber out; that Hilliard went behind the bar, took the bartender's gun and started running for the door; that "a lot of shooting" broke out; that someone threw a stool at Hilliard, but he brushed it aside and kept running for the door; that when he reached the door he was shot; that he ran to the car, followed by Larry and Sonny, and they drove away in a white 1964 Pontiac.

7. Hilliard does not challenge the admissibility of the statement on the ground that he did not knowingly and intelligently waive his right to remain silent and his right to counsel.

pra, the following facts were established at the suppression hearing:

At approximately 6 a. m. on December 23, 1972, Hilliard was questioned by Detective Joseph Flanagan at our Lady of Lourdes Hospital in Camden, New Jersey. Initially, Hilliard was in a room with three other patients. Flanagan identified himself and informed Hilliard that he was investigating a murder which had been committed in a bar at Ninth and Venango Streets in Philadelphia. Flanagan advised Hilliard of his rights as mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and asked him the accompanying questions on a standard police interrogation card. Hilliard's answers to those questions indicated an awareness of his rights and a willingness to waive them. The questioning lasted about an hour and a half, during which time Hilliard ate breakfast and hospital personnel entered and exited the room. Hilliard was then transferred to a private room where the questioning continued off and on until shortly before noon. Flanagan made a record of the interview on a stenographic tablet and after the interview was completed Hilliard signed his name to this record.[8] Flanagan testified at the suppression hearing that he found Hilliard alert and responsive at all times during the interview. Hilliard gave no indication of pain or grogginess during this period and at one point got out of bed on his own and used the toilet facilities. At no time did any of the medical personnel object to Flanagan questioning Hilliard.

Hilliard was questioned again later that afternoon by Detective Brown. Brown arrived at the hospital at approximately 4:05 p. m. and informed the head nurse he wished to question Hilliard. The nurse put Brown in touch with the doctor treating Hilliard. Brown ex-

8. This statement was not presented as evidence at trial and Hilliard raises no claim with respect to it. The facts surrounding this statement are presented for the sake of completeness in evaluating the totality of the circumstances.

plained his purpose to the doctor and obtained his permission to question Hilliard. Hilliard was in a hospital gown and sitting up in bed during this period of questioning. Brown gave Hilliard his Miranda warnings and asked the accompanying questions from the police interrogation card. Hilliard again indicated his willingness to answer questions without the presence of an attorney. This period of questioning lasted from 4:30 p. m. to 6:30 p. m. during which time Hilliard ate his dinner. Brown testified that he did not ask any questions while Hilliard ate, but left the room. The result of this questioning was a ten-page statement handwritten by Brown which Hilliard read aloud and signed at the bottom of each page. Hilliard acknowledged these signatures at the suppression hearing. Brown testified that Hilliard was alert and responsive throughout the interview and further, that no threats or promises were made during the interview. As Brown left Hilliard's room Hilliard's wife came in to visit him.

Hilliard spent two days in the hospital and was transferred to the Camden County Jail the day before his extradition hearing which was held in Camden on December 26, 1972, at approximately noon. After the hearing Detective McGurk took Hilliard into custody at approximately 12:45 p. m. and transferred him to the Philadelphia Police Administration Building at Eighth and Race Streets in Philadelphia. Hilliard was placed in an interrogation room within the Homicide Division, Room 104, at approximately 1 p. m. and at approximately 1:30 p. m. McGurk, in the presence of another detective, informed him that he was again to be questioned about the murder of William Coates. Hilliard was again advised of his constitutional rights and his answers to the detectives' questions indicated his willingness to make a statement. Hilliard then made a statement which was recorded on a typewriter by McGurk as Hilliard spoke. The statement was concluded by 3:20 p. m. and by 4:00 p. m. Hilliard

read and signed every page of the three copies of the statement. No threats or promises were made to Hilliard and he did not complain of physical discomfort at any time. He was alert and cooperative throughout this period of questioning. During the questioning Hilliard received fresh bandaids for his wounds. Finally, Hilliard made no request for an attorney during this period of interrogation nor did he ask to make a phone call until approximately 4:25 p. m.

On December 26, 1972, Hilliard's wife contacted the Defender's Association about 2 p. m. to seek assistance for her husband. At approximately 2:15 p. m. Assistant Defender Steven Koplove went to the Homicide Division, Room 104, at the Police Administration Building and requested to see Hilliard. He was informed by two detectives there that no Thomas Hilliard was being held. There was a lot of confusion in the Homicide Division that day because a police officer had been killed. Koplove returned at approximately 3 p. m. and again requested to see Hilliard. He was informed by the desk sergeant that no Thomas Hilliard was in custody at that time. Koplove made a third request to see Hilliard at 3:20 p. m. and the desk sergeant again represented that Hilliard was not there. After a fourth request at 3:40 p. m. Koplove was finally informed that Hilliard was there but did not want to see an attorney. Koplove did not see Hilliard until approximately 8 p. m.

The test for reviewing the suppression court's conclusion that Hilliard's statement to Detective McGurk was voluntary is "whether [Hilliard] had sufficient mental capacity at the time of giving his statement to know what he was saying and to have voluntarily intended to say it," *Commonwealth v. Smith*, 447 Pa. 457, 460, 291 A.2d 103, 104 (1972), and all "attending factors and circumstances must be considered and evaluated." *Commonwealth v. Goodwin*, 460 Pa. 516, 522, 333 A.2d 892, 895 (1975). See also *Commonwealth v. Johnson*, supra;

*Commonwealth v. Purvis,* 458 Pa. 359, 326 A.2d 369 (1974); *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A.2d 426 (1968).

The facts of the instant case require no extended discussion; the burden is on the Commonwealth to prove voluntariness only by a preponderance of the evidence and in view of the suppression court's findings which have ample support in the record, I am satisfied this burden was met. Hilliard, a twenty-year-old, married man, was warned of his constitutional rights at least three times; he was not questioned for excessive periods; the interrogations were separated by adequate rest periods; he was not deprived of food; he was not threatened or promised leniency; and finally, the record of the suppression hearing is absent of evidence establishing involuntariness as a matter of law. Although the fact that an attorney was unable to contact Hilliard while he was making an incriminating statement is a condition from which involuntariness may be inferred, it does not establish involuntariness as a matter of law. See *Commonwealth v. Yates,* 467 Pa. 360, 357 A.2d 133 (1976). Indeed, in the instant case, there is evidence in the record which indicates that the misinformation Koplove received was the result of an honest mistake due to the excitement in the Homicide Division that day. Significantly, there is also a showing in the record that Hilliard did not request that he be allowed to see an attorney. Under the circumstances, I am not prepared to say the Commonwealth failed to establish that the statement secured by Detective McGurk was voluntary.

## III

The statement taken by Detective Brown was presented during the Commonwealth's case in chief without objection. After the Commonwealth rested, Hilliard took the stand and denied his criminal involvement in the incident. During his testimony Hilliard claimed that he

had never seen Brown and that he had no recollection of giving a statement to him. On cross-examination, when questioned as to whether he had given a statement to Detective McGurk, Hilliard denied giving or signing an incriminating statement for McGurk and said he told this officer he was not a participant in the robbery or killing and his presence in Cassidy's Bar at the time was pure coincidence. In short, Hilliard testified he told the same version of the incident to McGurk as he related at trial.

The Commonwealth called Detective McGurk in rebuttal. McGurk testified that he had taken a recorded statement from Hilliard on December 26, 1972, and that Hilliard signed each page of the statement in his presence. The statement was then read into evidence without objection. As noted earlier, the substance of the statement was that Hilliard knew of the robbery and was an active participant, although he ran out when the shooting started. The statement also contained a denial by Hilliard that he killed anyone.

Hilliard's counsel then requested the opportunity to present surrebuttal evidence. Specifically, counsel made the following offer of proof:

"MR. ATKINSON: If the Court pleases, I would respectfully request the opportunity in the morning hours to present evidence in surrebuttal to that offered by the District Attorney on rebuttal.

"That evidence would consist of testimony by Mr. Steven Koplow that he was the Assistant Defenders— one of the Assistant Defenders at the Roundhouse on the date in question, which would be December 26, I believe, at the Police Administration Building.

"That he made numerous attempts between the hours of one-thirty, and three-thirty, at such time as the defendant was having a formal statement taken from him, to reach the defendant at the instructions of superiors in his office, the Public Defender.

"I would ask that that testimony be offered for the purpose of permitting the jury, if it so chooses, to draw an inference that such statement was involuntarily taken.

\* \* \*

"My purpose is merely to show—or, the inference to be drawn is that police officials were withholding the defendant from contacts with his family, or agents of his family; namely, the attorneys; *that from this fact, which they will testify to,* an inference can be drawn that the statement was involuntarily taken." (Emphasis added.)

The trial court sustained an objection to this offer of proof on the ground that it was not proper surrebuttal evidence. The court reasoned that since Hilliard had testified to having willingly discussed the robbery with McGurk, voluntariness was not an issue; only the content of what was said was drawn in question. This reasoning is contrary to the principle that a "defendant is not bound by a single defense at trial; he may offer as many alternative defenses as he so chooses, and they need not be consistent." *Commonwealth v. Joyner,* 469 Pa. 333, 365 A.2d 1233 (1976).

While it is true that the statement taken by McGurk was introduced primarily to rebut Hilliard's trial testimony that he told McGurk the same story he related to the jury at trial, i. e., to establish what Hilliard said, it is also true that there was an issue as to the truth of what was said. Although the jury may have believed Hilliard gave the statement as testified to by McGurk, it was still the Commonwealth's burden to satisfy the jury the statement was given freely and voluntarily, and the testimony of Koplowe was relevant to this issue.

With regard to the question of whether the offer by defense counsel was sufficient, i. e., whether it proposed evidence tending to show involuntariness, it is well-established that "any facts, circumstances, or events tending

to overbear the will of the accused" are relevant to the issue of voluntariness, *Commonwealth v. Purvis*, 458 Pa. 359, 364, 326 A.2d 369, 371 (1974), including "the duration, and the methods of interrogation, the conditions of detention, the manifest attitude of the police toward the defendant, the defendant's physical and psychological state and all other conditions present which may serve to drain one's powers of resistance to suggestion and undermine his self-determination." *Commonwealth v. Alston*, 456 Pa. 128, 134, 317 A.2d 241, 244 (1974). In the instant case the offer asserted that an attorney was prevented from contacting Hilliard at the time he was making an incriminating statement to the police. This evidence, if proven, would have established a condition under which the statement was obtained from which the jury may have inferred that Hilliard was overreached.[9] Notwithstanding the strength of the Commonwealth's evidence showing voluntariness, evidence that Hilliard was held "under wraps" was appropriate for the jury's consideration and thus, defense counsel should have been allowed to present such evidence.

Although I agree the court erred in not permitting Hilliard's proposed surrebuttal testimony, I am not persuaded under the circumstances that this warrants a new trial. As noted before, Hilliard's incriminating statement to Detective Brown was admitted for the jury's consideration without objection.[9A] In this statement Hilliard admitted participation in the robbery and also to shooting Coates. He did not admit the latter to Detective McGurk; hence, in a very real sense evidentiary use

9. I do not indicate that there was overreaching in the instant case. I would rule only that Hilliard should have been allowed to present evidence on the issue of the voluntariness of the statement taken by Detective McGurk.

9A. Hilliard does not presently challenge the suppression court's ruling with respect to the admissibility of the statement taken by Brown.

of the statement to Brown was much more damaging.[10] Since the jury had the benefit of the statement to Brown I cannot see how the error of excluding the proposed sur-rebuttal testimony was of much consequence. Furthermore, Hilliard's trial testimony that he was not an active participant in the crime was contradicted by three eyewitnesses. In view of all this I am convinced beyond a reasonable doubt that the error was harmless. *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Commonwealth v. Davis,* 452 Pa. 171, 305 A.2d 715 (1973).

## IV

Hilliard next asserts that the trial court's instruction on the issue of the voluntariness of his statements to the police was inadequate and, hence, deprived him of a fair trial.

It is the law in Pennsylvania that a criminal defendant is entitled to have the issue of voluntariness considered by the jury as a factual question even though there has been a legal finding of voluntariness by a suppression court. *Commonwealth v. Joyner,* 441 Pa. 242, 272 A.2d 454 (1971); *Commonwealth v. Heckathorn,* 429 Pa. 534, 241 A.2d 97 (1968); *Commonwealth v. McLean,* 213 Pa. Super. 297, 247 A.2d 640 (1968). The jury must find the statement voluntary before they may consider it and if they determine it to be involuntary, they must disregard it.[11]

In the instant case the trial court instructed the jury that it was their duty to determine the voluntariness of

10. It is pertinent to note the statement taken by McGurk was introduced by the Commonwealth in rebuttal and its primary purpose was to rebut Hilliard's testimony that he told McGurk the same story he related to the jury at trial.

11. Pennsylvania follows the Massachusetts or humane rule. Under the orthodox rule, voluntariness is determined solely by the judge; the jury considers voluntariness only as it affects the weight or credibility of the statement.

the statements made by Hilliard to the police and enumerated various factors relevant to the voluntary character of the statements. The court failed, however, to instruct the jury to disregard the statements if they determined them to be involuntary. It is this omission that is the basis of Hilliard's claim of error.

I would not reach the merits of this claim, however, because this issue has not been properly preserved.

Following the court's charge to the jury, but before the jury retired to deliberate, an in camera discussion was had for the purpose of hearing objections to the charge. During that consultation defense counsel made a number of specific objections on points unrelated to the instant issue, and in addition, the following colloquy took place:

"MR. ATKINSON: I request point 13, point 14, point 17.

"THE COURT: Fourteen—

"MR. ATKINSON: Thirteen, fourteen, fifteen, seventeen, and eighteen.

"THE COURT: I will give you number fourteen. I think you might be entitled to that, if I didn't touch it. All right?

"MR. ATKINSON: Yes, sir. Now lastly, I would except to the Court's part of the charge, in reviewing the evidence, which I felt was done from the Commonwealth's point of view. I would therefore request an exception to the Court's charge and review of evidence. I do that most respectfully, sir."

Specifically, point number seventeen of defense counsel's requested points for charge read as follows:[12]

"17. If you believe that the defendant, THOMAS HILLIARD, did not knowingly and intelligently understand his constitutional rights when read by

12. None of the other requested points for charge are germane to these appeals.

Detective Brown, then you must find that the statement was involuntarily given and must disregard its contents."

Hilliard apparently argues that if requested point number seventeen had been granted, the omission in the court's charge would have been avoided and this was sufficient to preserve the issue. I do not agree.

Pa.R.Crim.P. 1119(b) provides in pertinent part: "No portions of the charge nor omissions therefrom may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate." One of the main reasons underlying this rule is that a specific exception will allow the trial court an opportunity to correct the asserted error, thereby promoting judicial economy and efficient operation of our judicial system. *Commonwealth v. Sisak*, 436 Pa. 262, 259 A.2d 428 (1969); Cf. *Commonwealth v. Mitchell*, 464 Pa. 117, 346 A.2d 48 (1975); *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974). And although we have said that a defendant's requested instruction will be sufficient to alert a trial court to an error in its jury charge, *Commonwealth v. Palmer*, 467 Pa. 476, 359 A.2d 375 (1976); *Commonwealth v. Williams*, 463 Pa. 370, 344 A.2d 877 (1975); *Commonwealth v. Mitchell*, 460 Pa. 665, 334 A.2d 285 (1975); *Commonwealth v. Sisak*, supra, I am of the opinion that Hilliard's request for point number seventeen in the instant case was inadequate to alert the trial court to the omission in its voluntariness instruction.

In *Commonwealth v. Sisak*, supra, this Court stated ". . . that a party *whose requested point,* although erroneous, *alerts the trial judge to an important issue in the case,* does have just cause for complaint if the law to which that point pertains is not otherwise correctly stated in the charge." 436 Pa. at 270 n. 5, 259 A.2d at 432 n. 5. (Emphasis added.) This language clearly contemplates a requested instruction which sufficiently alerts the trial court to the defect in the court's

charge. Thus, the threshold inquiry instantly is the narrow question whether the requested instruction should have alerted the trial court to the omission in its voluntariness instruction.[13]

A close reading of requested point number seventeen reveals that it pertains only to the statement taken by Detective Brown and that, notwithstanding the use of the word "involuntarily", the requested point calls for the jury to decide whether Hilliard knowingly and intelligently waived his constitutional rights before he made the statement.[14] In this respect Hilliard's requested point for charge concerned a principle of law significantly different from that addressed by the court's voluntariness instruction, see *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976); *Commonwealth v. Williams*, 443 Pa. 85, 277 A.2d 781 (1971), and it is this principle that is the outstanding characteristic of requested point number seventeen. The trial court could have reasonably assumed that Hilliard requested point number seventeen for the purpose of having the jury instructed on the question of the waiver of his *Miranda* rights rather than for the purpose of calling attention to the omission in the court's voluntariness instruction. In short, point number seventeen is not addressed to the omission in the charge now complained of and thus, cannot be said to have ade-

13. All of the cases wherein we ruled that a defendant's requested instruction was sufficient to alert the court to an error in its charge, *Commonwealth v. Palmer*, supra; *Commonwealth v. Williams*, 463 Pa. 370, 344 A.2d 877 (1975); *Commonwealth v. Mitchell*, 460 Pa. 665, 334 A.2d 285 (1975); *Commonwealth v. Sisak*, supra, fit within this analysis. In each of those cases it was clear from the requested instruction what aspect of the court's charge was in dispute.

14. It is significant to point out that Hilliard does not argue that the question of whether a defendant knowingly and intelligently waived his *Miranda* rights should be submitted to the jury and hence, that issue is not before us. Hilliard does not argue that requested point number seventeen should have been submitted to the jury, but rather that requested point number seventeen gave notice of the omission in the court's voluntariness instruction.

quately alerted the trial court to the defect in its voluntariness instruction. On these facts it was incumbent upon Hilliard to detail the reason for his request because it was not obvious from the context in which it was presented. The rationale behind the special exception rule that a party cannot sit silently by, taking his chances on a favorable verdict, and then complain of matters which could have been corrected at trial had they been brought to the court's attention applies with full force to the instant situation.

V

Hilliard also complains that the trial judge committed reversible error when he refused to instruct the jury on voluntary manslaughter. Initially, I note that Hilliard does not argue and the record does not indicate that there was any evidence to support a verdict of voluntary manslaughter. Additionally, Hilliard was convicted before *Commonwealth v. Jones,* 457 Pa. 563, 319 A.2d 142 (1974), and *United States ex rel. Matthews v. Johnson,* 503 F.2d 339 (3d Cir. 1974). Thus, we are faced with the following questions:

"(1) Do federal constitutional considerations mandate the application of *Matthews* to cases on direct appeal where the trial antedated both *Jones* and *Matthews?*

"(2) If federal constitutional considerations do not mandate the application of *Matthews* to such cases, should we, pursuant to our supervisory powers, apply *Matthews,* in this context more precisely *Jones,* to such cases?"

*Commonwealth v. Cain,* 471 Pa. 140, 369 A.2d 1234 (1977) (Opinion in Support of Affirmance). These issues were thoroughly discussed in *Commonwealth v. Cain,* supra, and for the reasons stated therein, I would reject Hilliard's claim of error on this point.

## VI

Hilliard's next assignment of error is that the trial court committed reversible error by denying a motion for a mistrial at the conclusion of the Commonwealth's case in chief. That motion was based on the following statement by the Assistant District Attorney.

"MR. MURRAY: Your Honor, the Commonwealth is preparing to rest its case in this particular matter, but prior to doing so, I want the record to reflect that the Commonwealth is making available to defense counsel all of the people that were present in the bar at 828 Vanango Street at the time of this incident, and that counsel has had an opportunity to talk to them during the lunch hour."

Hilliard urges these remarks impinged upon his right to select the witnesses to be called on his behalf, and more importantly, gave rise to an unfavorable inference in the minds of the jurors when he failed to call these particular witnesses in his defense.

It is beyond cavil that a criminal accused is under no duty to take the stand or produce evidence of his innocence, but may stand behind the protection of the presumption of innocence and demand that the Commonwealth sustain its burden of proving his guilt beyond a reasonable doubt. As a general rule the failure of a defendant to call witnesses may not be used to rebut the presumption of innocence. *Commonwealth v. Miller*, 205 Pa.Super. 297, 208 A.2d 867 (1965); see *Commonwealth v. Wright*, 444 Pa. 536, 282 A.2d 323 (1971). Nor may the prosecution attempt to capitalize on a refusal to testify on the ground of a privilege against self-incrimination. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Commonwealth v. Greene*, 445 Pa. 228, 285 A.2d 865 (1971).

Hilliard argues that the district attorney's remarks compelled him to either call the eyewitnesses or to take

the stand and explain why he did not call them. In fact, however, Hilliard did not call any of the patrons of the bar nor did he attempt to explain by his own testimony his failure to do so. Thus, any notion that the district attorney's comments coerced Hilliard into shedding the protection of the presumption of innocence can be rejected. The question remains, however, whether Hilliard suffered from an unfair prejudicial inference by virtue of his failure to call the patrons or to explain his failure to do so. I am not persuaded that these brief remarks so prejudiced Hilliard as to require a mistrial.

> " 'Every unwise or irrelevant remark made in the course of a trial by a judge, a witness, or counsel does not compel the granting of a new trial. A new trial is required when the remark is prejudicial; that is, when it is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial.' "

*Commonwealth v. Goosby*, 450 Pa. 609, 611, 301 A.2d 673, 674 (1973) quoting *Commonwealth v. Phillips*, 183 Pa.Super. 377, 382, 132 A.2d 733, 736 (1957).

In the instant case the district attorney did not request the jury to draw any inference from his comment and no other statement was made during the four-day trial that even arguably referred to Hilliard's failure to call these witnesses. The trial court instructed the jury that the only evidence to be considered in the case was that heard from the witness stand. It is also pertinent to note that prior to trial the court instructed the jury panel at length on the presumption of innocence as it relates to a defendant's right not to present evidence. Finally, I point out that defense counsel did not request a cautionary instruction in this regard. Accordingly, Hilliard's claim of error on this point should be rejected.

In sum, I have carefully considered each and every complaint Hilliard now asserts [15] and find no reason to interfere with the judgments entered in the trial court.

The judgments should therefore be affirmed. I dissent.

Mr. Chief Justice JONES and Mr. Justice POMEROY join in this opinion; Mr. Justice NIX joins in Part V of this Dissenting Opinion.

**15.** Hilliard's final contention that certain photographs were admitted into evidence without proper authentication is totally without merit.