485 A.2d 275

**Kamel Ali ELFADL**

v.

**STATE of Maryland.**

**No. 506, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Jan. 3, 1985.

Clarence W. Sharp, Assigned Public Defender, Annapolis (Alan H. Murrell, Public Defender, Baltimore, on brief), for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore; Arthur A. Marshall, Jr., State's Atty., for Prince George's County and William D. Missouri, Asst. State's Atty., for Prince George's County, Upper Marlboro, on brief), for appellee.

Argued before BLOOM, GETTY, and ROBERT M. BELL, JJ.

GETTY, Judge.

On December 16, 1983, the State filed a Suggestion for Removal in the case of Kamel Ali Elfadl, appellant herein, who was charged, jointly with Kenneth James Lodowski,[1] in a nine count indictment with the murder of Carlton X. Fletcher and Minh Huong Phamdo. Additionally, appellant was charged with six counts of conspiracy and armed robbery of Phamdo. Appellant's case was removed to the Circuit Court for Calvert County where, following a jury trial, he was convicted on all nine counts (as a principal in

1. Appellant's co-defendant, Lodowski, was tried separately in the Circuit Court for Charles County, convicted and sentenced to death. His appeal is pending before the Court of Appeals.

the second degree in the premeditated murder of Fletcher and as a principal in the first degree in the premeditated murder of Phamdo). Appellant was sentenced to six consecutive terms of life imprisonment[2] and to three consecutive twenty year terms of imprisonment.[3]

Appellant has preserved five issues for review, namely:

1. Did the trial court err in denying appellant's motion to suppress the extra-judicial statements given to the police?

2. Did the trial court err in permitting the case to be removed from Prince George's County upon suggestion by the State?

3. Was appellant properly convicted and sentenced on six separate conspiracies?

4. Did the trial court err in denying appellant's request to have the writings on the waiver of rights forms examined by an expert chromotographer?

5. Did the trial court err in permitting the State's witnesses to refer to the first statement, which was suppressed by the trial court, prior to appellant testifying on his own behalf?

### Background

At 11:45 P.M. on Saturday, June 11, 1983, Prince George's County policeman Carlton X. Fletcher and Ming Huong Phamdo, Assistant Manager of the Goddard Minimart in Greenbelt, were shot and killed by two assailants who robbed them of more than $20,000.00. The money represented the night deposit of the Minimart which was to

---

2. Murder of Fletcher (first count); murder of Phamdo (second count); conspiracy on June 11, 1983, to murder Fletcher (third count); conspiracy to murder Phamdo (fourth count); conspiracy between May 1 and June 18, 1983, to murder Fletcher (fifth count); conspiracy between May 1 and June 18, 1983, to murder Phamdo (sixth count).

3. Armed robbery of Phamdo (seventh count); conspiracy on June 11, 1983, to rob Phamdo (eighth count); conspiracy between May 1 and June 18, 1983, to rob Phamdo (ninth count).

be deposited by Phamdo; Fletcher accompanied him as a guard. Phamdo walked from the minimart carrying several money bags in a paper sack. Fletcher was seated nearby in a marked Prince George's County patrol car. Phamdo was fatally shot in the right chest by a rifle slug fired from a twenty gauge shotgun as he approached his car which was parked near the police vehicle. Fletcher was killed by a shotgun blast to the left side of his neck while seated in the cruiser. In short, Phamdo and Fletcher were ambushed. Allegedly, appellant killed Phamdo and Lodowski killed Fletcher.

Investigators at the scene recovered a spent twenty gauge shotgun shell and a shipping carton for a twenty gauge shotgun. The carton was traced to a J.C. Penney Store where appellant had purchased the shotgun on March 25, 1983.

Appellant was stopped by the police while driving his car on the day following the murders. He accompanied the officers present to the police station where he was interviewed for approximately ninety minutes by Detective Steven Ricker. At approximately 5:40 P.M., Detective David Hatfield took over the questioning which continued for nearly three hours. At 8:30 P.M. appellant indicated that Sunday was a Moslem religious day and he desired to go to his apartment to pray and eat. Accompanied by two police officers, appellant was allowed to fulfill his request.

Between 9:30 and 9:45 P.M., appellant was returned to the police station where the questioning resumed. Sometime prior to 1:30 A.M. on June 13, the substance of the interview was reduced to writing and signed by appellant. Appellant then consented to undergo a polygraph examination that lasted for two and one-half hours. Additional questioning by the police continued until 3:00 P.M. on Monday, June 13, at which time appellant was returned to his apartment. A consent search of the apartment was conducted wherein the police recovered some items and

departed. Officer Hatfield ordered a continuous surveillance of appellant after leaving him at the apartment.

Recapping, the initial detention covered a twenty-four hour period; from 3:00 P.M. Sunday, June 12, to 3:00 P.M. Monday, June 13. No *Miranda* warnings were given, the police maintaining that appellant was not a suspect at the time and that he was free to leave if he chose to do so. The statement, however, was suppressed by the trial judge for failure to advise appellant of his *Miranda* rights after he became a suspect in the murders.

Appellant became aware of the surveillance following his release and contacted an attorney, Stephen Kiefert, on Wednesday, June 15. He advised Kiefert that he had been questioned about the recent murders and he made an appointment to meet with the attorney at 2:00 P.M. the following day. The police had retained appellant's driving license and on Thursday morning he telephoned the police in an effort to retrieve the license. He was told to come to the station.

At 12:30 P.M. appellant and his wife went to the police station and met with Detective Hatfield. Appellant stated that he advised Hatfield of his appointment with an attorney at 2:00 P.M.; Hatfield denied that any such statement was made. Appellant was then advised of his *Miranda* rights, executed a waiver form and the interrogation began anew.

The session with Hatfield began about 1:00 P.M. on Thursday afternoon and continued for nearly twelve hours until Detective Ferriter took over. Appellant was advised of his rights a second time and signed another waiver of those rights. After an hour with Ferriter, Detective Edgar (who had been quizzing Lodowski in another room) appeared, obtained a third waiver and questioned appellant until 3:00 A.M. Friday. Detective Hatfield returned, appellant executed a fourth waiver, and a second statement was typed between 5:34 A.M. and 10:36 A.M. Three pages of the eleven page statement were in appellant's handwriting,

the remaining eight were typed. Appellant signed the statement shortly before noon on Friday.

Within an hour of Hatfield's departure, Officer Gentile confronted appellant who was asleep on a chair in the interrogation room. Appellant was awakened, advised of his *Miranda* rights, signed a waiver of those rights, and admitted his complicity in the murders. A charging document was then prepared and a District Court Commissioner came to the police station where appellant was being held. The form prepared by the Commissioner indicated that appellant wished to have the services of an attorney. Appellant was committed without bail while Gentile, preceded by another signed waiver form, prepared a twelve page typed statement (the third statement) which was completed at 6:05 P.M. Thus, appellant's visit to the police station for the purpose of retrieving his driver's license resulted in a 29 hour stay; he arrived at 1:00 P.M. Thursday and the encounter concluded at 6:05 P.M. Friday.

Meanwhile, appellant's wife, who accompanied him to the police station to get his license, remained at the scene until 4:00 A.M. Friday. At noon on Friday she called another attorney, Harry Trainor. A second call to Trainor at 3:00 P.M. resulted in his being retained to represent appellant. Counsel's telephone request to the police seeking to speak with appellant was refused because the officer who received the call "wasn't going to interrupt that particular interview." Arriving at the police station at 4:20 P.M., Trainor requested to speak with appellant and, when this was denied, requested that appellant be given counsel's card; this request was also refused.[4]

Trainor unsuccessfully continued his attempts either to see appellant or to have appellant advised of his presence. The first time that appellant and counsel met was on Saturday afternoon at the Detention Center in Upper Marl-

---

4. The efforts of counsel to converse with his client are markedly similar to the equally futile attempts set forth in *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

boro. The police concluded, and advised Trainor, that appellant was not his client because appellant did not call him.

We have set forth the time frame of the various interrogations in order that we may consider appellant's claim that he was denied his constitutional right to the assistance of counsel granted by the Sixth and Fourteenth Amendments to the Constitution.

The first statement was suppressed for failure to advise appellant of his rights under *Miranda.* Statement number two was admitted by the trial court because it was preceded by *Miranda* warnings which the court concluded were effectively waived. The second statement, moreover, was exculpatory. Appellant admitted in his second statement his sudden pecuniary gain ($4,000.00) and attributed the source of the funds to three vaguely described men, one of whom had allegedly purchased appellant's shotgun several days before the robbery and murders. The third statement, also admitted into evidence at trial, was a confession by appellant that he and Lodowski planned and committed the robbery and two killings. This final statement was preceded by *Miranda* warnings and a signed waiver by appellant.

According to the record, counsel was retained, albeit without appellant's knowledge, at the same time the third statement was being reduced to writing. Conceding that appellant was not made aware of a specific attorney's presence at the station house, and that the police denied counsel's request to confer with his client, the State maintains that any error in refusing to advise appellant of counsel's presence was harmless. The State contends that the oral confession was obtained by Detective Gentile prior to counsel's appearance and the written statement was thereby cumulative and merely a repetition of what Gentile testified to as appellant's oral confession. We are not persuaded that the introduction of a signed confession is harmless error beyond a reasonable doubt, *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1978), even assuming that a prior oral statement may be admissible. A signed confes-

sion, in our view, is unquestionably more compelling evidence of guilt than a police officer's testimony that a defendant made incriminating admissions. In the latter situation the issue of credibility arises. A defendant may deny making inculpatory statements and the issue then becomes one of credibility for the trier of fact. A defendant who has signed a confession has a more difficult task of persuading the trier of fact of his non-involvement in the crime alleged. We shall, therefore, address the issue of admissibility of the signed statement within the context of appellant's right to counsel and waiver of that right.

In *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); the Supreme Court stated:

"Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—whether by way of formal charge, preliminary hearing, indictment, information or arraignment."

*Accord, Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), holding that once adversary proceedings have commenced against him, an individual has a right to legal representation when the government interrogates him.

■ Unquestionably, judicial proceedings had been initiated against appellant before the third statement was reduced to writing. He had appeared before a District Court Commissioner and had been committed without bond. His Sixth Amendment right to counsel had attached, at the very latest, by the time of his court appearance.[5]

Appellant cites *State v. Fowler*, 259 Md. 95, 267 A.2d 228 (1970) as supportive of his alleged denial of a right to counsel. In *Fowler*, the defendant was subjected to interro-

---

5. The right to counsel attached when interrogation focused on appellant as an accused. It would exalt form over substance to defer the right to counsel until indictment. *See Escobedo, supra,* N. 4.

gation over a four day period relating to a murder.[6] Prior to each interrogation session, Fowler was advised of his *Miranda* rights, but the record was silent as to any response from Fowler on each occasion. The police admitted, however, that on the fourth day (the day the confession was obtained) Fowler telephoned his brother to find out if an attorney had been contacted to represent him.

An attorney arrived and conversed briefly with Fowler in the presence of several police officers. The attorney ascertained that Fowler had been advised of his *Miranda* rights and departed. Thereafter, the police continued their interrogation of Fowler resulting in a confession several hours later. Immediately after the oral confession, Fowler signed a mimeographed waiver from which included the *Miranda* warnings.

The Court of Appeals, in a four to three decision, held that the confession was obtained in violation of Fowler's rights under the Fifth and Sixth Amendments of the Constitution of the United States. The Court was disconcerted by:

1. Continued questioning after the telephone call seeking an attorney,
2. Ineffective consultation with counsel due to the presence of police officers during the interview between counsel and the accused and,
3. The waiver signed after the confession while "surrounded by his inquisitors."

Comparing *Fowler* with the present case, we note:

In the case *sub judice*, *Miranda* rights were given and waivers signed before statements two and three were obtained. The testimony is conflicting as to whether appellant herein advised the police that he had a 2:00 P.M. appointment with an attorney; appellant asserts that he so advised the police and the officers involved deny that any such

---

6. Fowler was in police custody for six days. The questioning over the first two days related to offenses other than the murder.

statement was made. That discrepancy, therefore, was for the trier of fact to resolve. We note further:

| Fowler | Appellant |
|---|---|
| <u>Miranda</u> warnings—waiver after confession. | No <u>Miranda</u> 1st statement (suppressed). <u>Miranda</u> warnings 2nd and 3rd statements. Waiver <u>before</u> confession. |
| Police aware that defendant sought an attorney. | Testimony conflicting. Appellant says he advised police of appointment with attorney—denied by police officers. Appellant advised District Court Commissioner that he desired counsel prior to typing and signing of written confession, but after oral confession. |
| In custody 6 days. Talked with family and attorney. | In custody 24 hours and released. Detained second time 29 hours. No communication with any non-police. |
| Attorney's request to see defendant prior to confession granted. | Attorney's request to see defendant denied while written statement (third) being transcribed. |
| Confession after conferring with counsel. | No counsel involved. |

Appellant argues that *Fowler* recognizes that the police must afford an accused the right to consult with an attorney even where, as here, the request does not originate with the accused, but from someone else on the behalf of accused. We agree that the factual situation in *Fowler* involved an attorney being retained by the family for the accused, rather than by the accused personally. Nothing in our reading of *Fowler*, however, supports appellant's claim. The majority in *Fowler* held that effective consultation with counsel is denied in an atmosphere where the accused is surrounded by his inquisitors during the interview with counsel. Thus, the Court concluded, the accused's Sixth Amendment right to counsel was abrogated. This in turn affects the quality of his volition in waiving his Fifth Amendment right not to incriminate himself.

We perceive appellant's principal argument as an assertion of an imperfect waiver of Fifth and Sixth Amendment rights based upon his contention that any waiver of counsel terminates once a specific attorney presents himself on behalf of the accused. Stated differently, the issue be-

comes whether the State, once an attorney is retained on appellant's behalf, must apprise appellant of that fact before further questioning may proceed. If the police are required to notify the accused that counsel is present, they must permit consultation between counsel and the accused, if requested by the accused, or advise the accused that counsel is readily available. The accused, of course, may again waive his right to confer with the attorney. The police, however, may not continue the interrogation absent another waiver. Our appellate courts have not addressed the issue.

The State argues that the failure of the police to inform appellant of the availability of a specific attorney retained on his behalf does not *per se* invalidate the waiver. We should adopt, the State urges, the "totality of the circumstances" approach adopted by Rhode Island. *State v. Burbine*, 451 A.2d 22 (R.I.1982).

A majority of those states that have considered the issue have held that an effective waiver of counsel terminates once a specific attorney appears on behalf of the accused.[7] The procedure adopted by the majority of jurisdictions that have considered the issue mandates informing the accused of the availability of counsel and obtaining a rewaiver of Fifth and Sixth Amendment rights before continuing the interrogation.

The issue has been discussed most recently in *Lewis v. State*, Okla.Ct.Crim.App., 695 P.2d 528 (1984). In *Lewis*, an 18-year-old was arrested for homicide. Two hours after the arrest an attorney retained by the accused's parents arrived at the jail to locate and advise his client. Interrogation had not commenced at the time counsel appeared. The accused was never advised that counsel was available. Counsel was

---

7. *Weber v. State*, 457 A.2d 674 (Del.1983); *Commonwealth v. McKenna*, 355 Mass. 313, 244 N.E.2d 560 (1969); *Commonwealth v. Hilliard*, 471 Pa. 318, 370 A.2d 322 (1977); *State v. Haynes*, 288 Or. 59, 602 P.2d 272 (1979), *cert. denied*, 446 U.S. 945, 100 S.Ct. 2175, 64 L.Ed.2d 802; *People v. Smith*, 93 Ill.2d 179, 66 Ill.Dec. 412, 442 N.E.2d 1325 (1982); *State v. Matthews*, 408 So.2d 1274 (La.1982); *State v. Jones*, 19 Wash. App. 850, 578 P.2d 71 (1978).

directed to various locations in the jail and courthouse. When he located his client one hour later, the accused had waived his right to counsel and had incriminated himself. On counsel's advice, however, he refused to sign a typed statement. The accused's conviction of first degree murder was reversed. The Court said:

> "[w]hen law enforcement officers have failed to admit counsel to a person in custody or to inform the person of the attorney's efforts to reach him, they cannot thereafter rely on defendant's waiver for the use of his subsequent uncounseled statements or resulting evidence against him."

We think that the view expressed by the majority is the proper one to be followed in Maryland. The minority view holds that a suspect's request for counsel must be honored, but a lawyer's request for a client need not be. While that statement may have some appeal and may be correct in some situations, it flies in the face of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that police interference with consultations between defendant and attorney "constitutes a violation of the Sixth Amendment right to the assistance of counsel and excludes any statement obtained in its wake." 602 P.2d at 278–79.

It is one thing to say a lawyer has no right to see a client; it is quite another to say that an accused knowingly and intelligently waived his right to counsel and his right against self-incrimination when he is purposely kept in the dark about the fact that his lawyer is in the next room.

Although appellant's testimony, that he advised the police that he was en route to his lawyer's office, was rejected by the trial court, we think it is significant that he told the District Court Commissioner that he wanted an attorney. The written confession introduced into evidence was obtained *after* his appearance before the Commissioner.

We hold that it was error to admit the confession obtained after counsel appeared and requested that appel-

lant be permitted to confer with him, or that appellant be advised of counsel's availability. We express no opinion on the admissibility of the oral confession that preceded the employment of counsel on appellant's behalf.

Our reversal as to the first issue makes it unnecessary to review appellant's remaining challenges. We do not lightly reverse a conviction for the brutal, senseless assassination of two citizens, one of whom was a police officer. The swift and relentless efforts of the police in apprehending those responsible is commendable. At the same time, the method employed in gathering evidence must conform to constitutional guarantees. A quotation from *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) is appropriate.

"... yet disinterested zeal for the public good does not assure either wisdom or right in the methods it pursues.... But it is precisely the predictability of those pressures that makes imperative a resolute loyalty to the guarantees that the constitution extends to us all."

JUDGMENTS REVERSED. CASE REMANDED TO CIRCUIT COURT FOR CALVERT COUNTY FOR NEW TRIAL.

COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.